```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      SOUTHERN DISTRICT OF ALABAMA

 3                            SOUTHERN DIVISION

 4   ==================================
                                        ) CRIMINAL NO. CR12-00210
 5   UNITED STATES OF AMERICA,          ) COURTROOM 2C
                                        ) U.S. FEDERAL COURTHOUSE
 6              PLAINTIFF,              ) MOBILE, ALABAMA
                                        ) DECEMBER 17, 2012
 7   VS.                                )
                                        ) SEALED TRANSCRIPT
 8   RANDY WILSON,                      )
     AKA: RASHEED WILSON,               )
 9                                      )
                    DEFENDANT.          )
10   ==================================)

11              TRANSCRIPTION OF DIGITAL RECORDING

12                     DETENTION HEARING

13          BEFORE THE HONORABLE KATHERINE P. NELSON

14           UNITED STATES DISTRICT COURT MAGISTRATE

15   APPEARANCES:

16   FOR THE GOVERNMENT:    CHRISTOPHER JOHN BODNAR
                            SEAN P. COSTELLO
17                          ASSISTANT U.S. ATTORNEY
                            U.S. ATTORNEY'S OFFICE
18                          63 SOUTH ROYAL STREET, SUITE 600
                            MOBILE, ALABAMA  36602
19
     FOR DEFENDANT RANDY WILSON:
20
                            DOMINGO SOTO
21                          MADDEN & SOTO
                            465 DAUPHIN STREET
22                          MOBILE, ALABAMA  36602

23   COURT REPORTER:        MELANIE WILKINS, RMR, CRR
                            OFFICIAL COURT REPORTER
24                          113 ST. JOSEPH STREET
                            MOBILE, ALABAMA  36602
25                          (251) 690-3371
```

<u>INDEX OF WITNESSES</u>

<u>PAGE</u> <u>LINE</u> <u>VOL</u>

**TIM GREEN – PLAINTIFF WITNESS**

DIRECT BY MR. BODNAR: . . . . . . . . . . .3   13    1
CROSS BY MR. SOTO:  . . . . . . . . . . .8   12    1
REDIRECT BY MR. BODNAR: . . . . . . . . . .26   14    1

**JEANNA WEAVER – DEFENSE WITNESS**

DIRECT BY MR. SOTO: . . . . . . . . . . .30   14    1
CROSS BY MR. COSTELLO:  . . . . . . . . . .34   16    1

1       [Proceedings digitally recorded and transcribed by machine

2       stenography.]

3       [December 17, 2012.  The defendant is present with counsel

4       in open court.]

5           THE CLERK:  Case set for detention hearing, matter

6    12-210, U.S.A. versus Randy Wilson.

7           Is the Government ready?

8           MR. BODNAR:  Ready to proceed, Your Honor.

9           THE CLERK:  Is the defendant ready?

10          MR. SOTO:  Ready.

11          THE COURT:  All right.  Mr. Soto, Sandra just handed

12   me this Memorandum of Law in Support of Release.  Did you file

13   that, or did you --

14          MR. SOTO:  I just put it together ten minutes ago.  I

15   have given it to them.

16          THE COURT:  That was my next question.

17          Okay.  And you put it together ten minutes ago, and I

18   read it in like three minutes.

19          MR. SOTO:  That's fine.

20          THE COURT:  So I just had a moment to review it.

21          All right.  Mr. Bodnar, are you ready to proceed on

22   the detention hearing?

23          MR. BODNAR:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MR. BODNAR:  Your Honor, the United States calls

```
1    Special Agent Tim Green.

2           THE COURT:  All right.  Agent Green, would you come

3    up.

4

5                          TIM GREEN,

6          called as a witness on behalf of the Plaintiff,

7          having been first duly sworn, testified as follows:

8

9           THE COURT:  Agent Green, when you get seated, you can

10   just adjust the mic.

11

12                      DIRECT EXAMINATION

13   BY MR. BODNAR:

14   Q.    Would you please state your name for the Court.

15   A.    Tim Green.

16   Q.    And, Mr. Green, where do you work?

17   A.    Federal Bureau of Investigation.

18   Q.    What do you do with the Federal -- with the F.B.I.?

19   A.    I'm a Special Agent Bomb Technician.  I investigate

20   general crimes that the F.B.I. has an interest in for the

21   Government.

22   Q.    And are you also on the Joint Terrorism Task Force within

23   the F.B.I.?

24   A.    Yes, sir.

25   Q.    And are you familiar with the case of Randy Wilson?
```

```
 1   A.    I am.

 2   Q.    And were you the lead case agent on that?

 3   A.    No, sir.

 4   Q.    Were you an agent that assisted on this?

 5   A.    Yes, sir.

 6   Q.    There has been a complaint filed in this case.  Have you

 7   reviewed this complaint?

 8   A.    I have.

 9   Q.    Are you familiar with the facts in it through either

10   personal knowledge or speaking with other agents?

11   A.    Yes, I am.

12   Q.    Based on your understanding of this case and your personal

13   knowledge, as well as speaking to other agents, are the facts

14   true and correct.  To the best of your knowledge?

15   A.    Yes, they are.

16   Q.    In addition, you were also part of -- were you also a part

17   of the arrest team for Randy Wilson?

18   A.    I was.

19   Q.    Could you please describe what occurred on December 11th

20   at Hartsfield Airport.

21   A.    Mr. Wilson was attempting to board an aircraft for his

22   flight with his family.  Myself and two other agents were the

23   arrest team that confronted him in the Jetway as he was making

24   his way to the entrance of the aircraft.

25   Q.    So if you're saying the "Jetway," he had already gone
```

```
1    through security; correct?

2    A.    Yes, he had.  He had already passed through all airport

3    security.  He had passed through the final boarding area and

4    went through the gate where the ticketing -- where the gate

5    agent would be at that would allow you on the plane.

6    Q.    And, again, so when you say "Jetway," that's literally

7    when you hand them the ticket and walk down that little

8    gangplank down onto the plane?

9    A.    Yes.  The kind of tunnel, if you will, that goes off the

10   main airport and connects you to that aircraft.

11   Q.    You were part of that arresting team?

12   A.    Yes, sir.

13   Q.    Once he was arrested, was he read his rights?

14   A.    Yes, he was.

15   Q.    What happened then?  Where was he taken?

16   A.    He was taken to the field office in Atlanta for the F.B.I.

17   And, there, he waived his rights and provided statements, as

18   well as a written statement, as to his intentions.

19   Q.    Can you please explain what it was that he told you guys

20   during the interview afterwards, after he waived his rights.

21   A.    Generally, Mr. Wilson explained that his intent for

22   leaving the country was to travel overseas and in a general way

23   position himself in a country where he could participate in a

24   violent jihad.

25   Q.    Did he explain to you what "violent jihad" meant?  What
```

1  did that entail?

2  A.   It did.  He explained that "violent jihad" would be some

3  type of conflict by which, according to his interpretation of

4  Islam, it would be honorable for him to participate in which

5  would be defending other Muslims in the course of some type of

6  conflict by which he would need to take up arms and defend

7  himself or others which would require him to take violent

8  actions, shoot or kill people.

9  Q.   And was it -- so was it discussed using weapons?

10  A.   It was.

11  Q.   And specifically did he talk about AK-47's?

12  A.   I don't recall specific weapons, but he was asked and did

13  speak very specifically about, if the time came, he could pick

14  up a weapon and engage others.

15  Q.   Was there any discussion about whether or not he could

16  engage in conflict against American troops if that option

17  became available?

18  A.   Again, it was general scenarios.  Mr. Wilson laid out that

19  if he was engaged in some type of violent jihad conflict and

20  there were U.S. military personnel in whatever country that may

21  be, that he would, if they were fighting against whoever he was

22  a part of, he would engage them as part of the violent jihad

23  that he talked about.

24  Q.   Special Agent Green, I want to jump back into the time

25  frame before December 2011 through late January of 2012.  Are

1   you aware of any other violent acts that Mr. Wilson was talking

2   about committing at that time?

3   A.   Well, there was a lot of discussion, as I recall, during

4   the investigation about how they would fund their travel

5   overseas and what type of things that they may do to raise

6   money.

7   Q.   What sort of options -- what sort of violent options were

8   discussed in terms of how to raise money for the trip?

9          MR. SOTO:  I'll object to the form of the question.

10  He keeps using the word "they," and there's at least one

11  undercover agent in this, confidential informant, and a

12  third -- a second co-defendant.  And these are general

13  conversations, and I object to the form of the question, unless

14  he can say what my client said.

15         THE COURT:  Rephrase that question.

16         MR. SOTO:  I object to the form of the question

17  because it's not specific as to my client.

18         THE COURT:  Okay.  Noted.

19         Go ahead, Mr. Bodnar.

20  BY MR. BODNAR:

21  Q.   Do you know, from talking with other agents, whether or

22  not Mr. Wilson was involved in these conversations?

23  A.   Yes.  Mr. Wilson had conversations where he talked about

24  the merits of performing some type of robbery or crime to gain

25  money for the travel that he needed to go overseas.

1    Q.    Did Mr. Wilson also talk about any sort of home invasions?

2    A.    He did.  That was one option that he discussed and laid

3    out, identifying owners of local businesses and, perhaps, maybe

4    doing a home invasion in order to rob them and get the money

5    that he needed.

6              MR. BODNAR:  One moment.

7         [Pause in proceedings.]

8              MR. BODNAR:  Pass the witness, Your Honor.

9              THE COURT:  Mr. Soto.

10

11                    CROSS-EXAMINATION

12   BY MR. SOTO:

13   Q.    So you were involved in taking him down at the Atlanta

14   airport?

15   A.    Yes, sir.

16   Q.    About what time was that?

17   A.    Roughly about 10:30 a.m. in the morning, I believe, sir.

18   Q.    And he was with his wife and children; correct?

19   A.    He was, sir.

20   Q.    Okay.  And you took him -- you Mirandized him, obviously?

21   A.    Yes, sir.  He -- upon his arrest, he was Mirandized right

22   there on the spot.

23   Q.    And you took him somewhere in Atlanta, to some office?

24   A.    Yes, sir, to the Atlanta F.B.I. field office.

25   Q.    Okay.  And, as is your practice, you probably didn't tape

1   record his statements, did you?

2   A.   That's correct, sir.

3   Q.   And he gave you a statement, did he not?

4   A.   He did.

5   Q.   And is it your testimony that this testimony that you're

6   talking about now this conversation about AK47's, that's not in

7   the statement, is it?

8   A.   Are you referring to the discussion about home invasions?

9   Q.   Right --

10  A.   Sir --

11  Q.   No, no, no, no.  I'm not talking about the home invasions.

12  You allege that at the F.B.I. office in Atlanta, he discussed

13  AK-47's and fighting American troops and all that.

14  A.   Just to make a point, sir, a minute ago when I was asked

15  about the AK-47, I don't recall a specific weapon type, but he

16  did talk about taking up arms in some type of violent jihad.

17  Q.   And he told you he was on his way to Mauritania, did he

18  not?

19  A.   Yes, sir, that was part of his general travel plans.

20  Q.   Okay.  And he was taking his family to Mauritania to study

21  in one of the large cities there and study Islam; did he tell

22  you that?

23  A.   He said that was kind of his cover story, if you will, for

24  his intent.  Ultimately, he admitted to the -- during the

25  course of the interview, that that was positioning himself in

1   Mauritania so he could be in a place that could get him close

2   to some type of jihad conflict.

3   Q.   But he didn't have some specific jihad that he was going

4   to visit, did he?

5   A.   No, sir.  He had general plans trying to position himself

6   to where it would be best conducive for him.

7   Q.   So he wasn't associating himself with any specific group,

8   was he?

9   A.   No, sir.

10  Q.   And he didn't have anything, other than some sort of

11  philosophical idea, about what he was going to do?

12  A.   Well, he had laid out his intent of what to do to the

13  point of picking the exact country where he wanted to go.  He

14  knew that Mali is a country that borders Mauritania, was

15  somewhere where he felt that, between those two countries or

16  others, that either jihad, a violent jihad, would break out and

17  he could join it at the origin of that conflict or that would

18  facilitate him moving elsewhere.

19  Q.   But my point is, he didn't have any specific claims as to

20  a specific jihad; in fact, he picked a country where there

21  wasn't a jihad.   Correct?

22  A.   That's correct, sir.

23  Q.   Okay.  And you keep using the term "violent jihad."  You

24  are aware that there's a distinction between "violent jihad"

25  and "jihad"?

```
 1   A.    I am, sir.

 2   Q.    And you're alleging that in his conversation with you that

 3   he used the term that he was going to engage in a "violent

 4   jihad"?

 5   A.    He did, sir.

 6   Q.    And that would be the scenario that you posited to him,

 7   all these scenarios that you planted in there, as far as the

 8   troops, he would be in a place where the Mauritanians, if

 9   that's where it happened, they would be involved in a defense

10   of Islam?  He did tell you that; right?

11   A.    The way he laid it out, he understood that there may be

12   multiple factions of groups supporting Islam in their own way,

13   and he told -- he said during the interview that he would

14   choose whichever side was in most agreement with his

15   interpretation of Islam and that would be the side that he

16   would take up arms with.

17   Q.    So you're aware of the Christian concept of "just war"?

18   Essentially, jihad is the Islamic version of the Christian term

19   "just war"; is that fair to say?

20   A.    I don't think that's fair.  I am familiar with the concept

21   of a Christian just war.  I am familiar with the concept of

22   Islamic jihad.  I don't think the two are equal.

23   Q.    They are not necessarily -- but they are kind of

24   analogous?

25   A.    Yes, sir.  Generally.
```

1   Q.    His intention -- he told you over the course of this that

2   he had at one time been more serious at one time than others,

3   did he not?

4   A.    He did.

5   Q.    And he told you that he was going overseas to create a

6   better life for his family, that he wanted his children to be

7   raised in an Islamic culture, did he not?

8   A.    Yes.  He did say that he wanted his family to be raised in

9   an Islamic culture.

10  Q.    Okay.  And he told you that here, as a Muslim, a

11  practicing Muslim in Alabama, he endured a lot of persecution?

12  Did he get into that with you?

13  A.    No, sir.  Not -- he did not state that during the

14  interview he was in.

15  Q.    But in his statement he never used the words "violent

16  jihad?"  That's something that either he told you during the

17  interview or that you -- for some reason you've managed to

18  input here?  It's not in the statement, is it?

19  A.    I would have to read his statement to see if it's in

20  there, sir, but it was something that he said during the

21  interview.

22  Q.    See if that refreshes your memory.

23  A.    I see the word "physical jihad."  He refers to, as well,

24  possibly a war between -- even in Israel, which he would join.

25  Q.    Those were all -- those were all stated in some sort of

1    ethereal future.  There's nothing concrete about any of that,

2    is there?

3    A.    Well, it's concrete as far as him kind of saying --

4    setting things in motion, but, yes, it was a general plan.

5    Q.    And he told you that he would join against combatants as

6    long as there was religious justification; correct?

7    A.    Yes.  In his interpretation of Islam.

8    Q.    And he told you he never intended to harm noncombatants,

9    did he?

10   A.    Actually, I recall him explaining about his idea of

11   collateral damage and how innocent people could get hurt during

12   the jihad and yet that would be justified.

13   Q.    So when he gave you the statement and he signed it and

14   you -- I'm assuming that there's a reason that you had him

15   write the statement down so that maybe in the future you would

16   use it in a court of law.

17          And it says that "I never intended to harm

18   noncombatants."  Why didn't you say, "Hey, that doesn't comport

19   with what you just told me."  Did you do that, Agent?

20   A.    Well, his statement is his statement.  You know, he was

21   given time to write down how he honestly wanted to portray

22   himself as far as telling the truth.  So he was not coached in

23   any way or talked to about his statements specifically because

24   that occurred after he had already explained himself verbally.

25   Q.    Well, did you write a report about this interview?

1   A.   There is a report that has been -- I don't know if it's

2   completed yet or not, but, yes, all interviews are summarized.

3   Q.   Your report that you signed, you did one?

4   A.   Yes, sir.  Uh-huh.

5        MR. SOTO:  Judge, under 18 U.S.C. 3500, the Jencks

6   Act, I would like a copy of that, please.

7        MR. BODNAR:  Your Honor, it has not been finalized.

8   And also the report was written by a different agent, not by

9   this agent.  We don't have it at this point.

10       THE COURT:  Agent, I misunderstood, then.  You didn't

11  write the report?

12       THE WITNESS:  All right.  The 302 is a collaboration.

13       THE COURT:  Right.

14       THE WITNESS:  So I have helped in writing it and have

15  also signed the report, but it is not finalized.  The last the

16  report was done was waiting on our supervisor's approval.

17       THE COURT:  Okay.  Mr. Bodnar -- hang on.

18  Mr. Bodnar, do you know when that will be done?

19       MR. BODNAR:  Hopefully today, Your Honor.  We don't

20  have a -- I have not received a finalized copy of it yet.  It

21  has not been signed.

22       THE COURT:  The Government doesn't have one in its

23  possession?

24       MR. BODNAR:  No.

25       MR. SOTO:  Then I move to continue this hearing,

1    Judge.  I'm entitled under Jencks; in addition, the local rules

2    call for this agent to have kept his notes, and I would ask to

3    see at least -- I don't think I'm entitled to the notes yet.

4             THE COURT:  No.

5             MR. SOTO:  But I think I'm entitled, under the Jencks

6    Act, a report that he made about this interview.

7             THE COURT:  Mr. Bodnar, what's the Government's

8    position on a continuance to allow him to see this information?

9             MR. BODNAR:  Your Honor, could I speak with the

10   F.B.I. back there just to see how quick we can get that?

11            THE COURT:  Yes, certainly.

12            MR. SOTO:  They probably have it now.

13            MR. BODNAR:  One moment, Your Honor.

14       [Discussion off the record.]

15            MR. BODNAR:  Your Honor, I'm told that it's approved

16   now.  They can run over to the F.B.I. and grab a copy, and we

17   can do some of the other arraignments.

18            THE COURT:  That's the next thing we'll do.  What's

19   his ETA?  Was it going to take 10, 15 minutes to go over there

20   and then Mr. Soto has to have a moment at that read it.  Why

21   don't we heel this until 3:00, and I'll go forward with some of

22   my other matters.

23            And I don't know what the Marshals want to do as far

24   as moving people around.

25       [Recess.]

```
1              THE COURT:  Okay.  All right.  Special Agent Green --
2    where is he?  All right.  Mr. Green, you're still under oath.
3    BY MR. SOTO:
4    Q.   So, Agent Green, have you been given an opportunity to
5    look at your report?
6    A.   I'd like to see it.  The last I saw it --
7              THE COURT:  The only one that hadn't seen it.
8              MR. SOTO:  Why don't you give him a copy of the
9    report.
10             THE COURT:  Thank you, Mr. Costello.
11             We left you out, Agent Green.
12             THE WITNESS:  And there's my name.  Okay.
13             MR. SOTO:  Let's at least give him an opportunity to
14   read it.
15             THE COURT:  Just stay there and read it, and let us
16   know when you're done.
17             THE WITNESS:  Okay.  The report is unchanged from
18   when I signed it.
19   BY MR. SOTO:
20   Q.   Okay.  So Mr. Wilson told you that prior to 2002, he had
21   been doing things like taking drugs and hanging out.  Do you
22   remember that conversation?  He characterized it as doing "not
23   good things."
24   A.   Right.  "Not good things," exactly.
25   Q.   Okay.  And then he told you in 2002, he started taking
```

```
1    Islam seriously?
2    A.    His religion more seriously, yes, sir.
3    Q.    And you know he'd been to an Islamic school up in
4    Birmingham prior to that; right?  He had gone to grade school
5    there; right?  Did you know that?
6    A.    I don't.
7    Q.    The -- let's see.  So, anyway, in 2002 to about 2008, he
8    started studying Islam pretty seriously; is that your
9    recollection?
10   A.    Yes, sir, that's what he told us.  Uh-huh.
11   Q.    And he also told you that he had over and over a period of
12   time been evolving his beliefs, didn't he?
13   A.    Yes, he did.
14   Q.    And he told you that at one time he had some beliefs and
15   that almost month by month and year by year they kept
16   developing into different -- differently; correct?
17   A.    That's correct.  Yes, sir.
18   Q.    And he told you that in 2000 -- at one point that an
19   war -- how do you say his name -- "al-Awlaki"?  "al-Awlaki"?
20   A.    Al-Awlaki, yes, sir.
21   Q.    He had followed this guy who is a terrorist; correct?
22   He'd followed him on the Internet?
23   A.    Yes, that individual's teaching.  They were published.
24   Q.    And he told you that at one time he agreed with his idea
25   of fatwa but that he no longer agreed with it.  Do you remember
```

1   him saying that?

2   A.    Yes.

3   Q.    And, Agent, why don't we just -- if you need your notes,

4   look at them, but, otherwise, we're not ever going to get

5   through here.

6            So he told you that he doesn't agree with people

7   deliberately -- I mean, with targeting people deliberately.  Do

8   you remember him saying that?

9   A.    Targeting innocent people?

10  Q.    Yes.

11  A.    Yes, sir.

12  Q.    And that's when he spoke about sometimes collateral damage

13  is unavoidable?

14  A.    Yes, sir.  That kind of came up at different times, yes,

15  sir.

16  Q.    But he was talking about this other guy, not himself?  At

17  the point when he was talking about the collateral damage, he

18  was kind of giving you an idea of what he thought about this

19  Anwar guy; correct?

20  A.    At times, yes.  Then he also talked about his idea of

21  collateral damage.

22  Q.    I'm going to walk you through your statement.

23  A.    Okay.  Yes, sir.

24  Q.    But at that point that's what we're talking about; right?

25  A.    Yes, sir.

1   Q.    And, as it relates to Somalia, he didn't deny all the

2   conversations about Somalia, did he?

3   A.    He did not.

4   Q.    And he told you that he had spoken to somebody on the

5   Internet by the name of Awan, Samwan Awan [phonetic]?

6   A.    Yes, sir.

7   Q.    And, in fact, I see he's been prosecuted somewhere else.

8   Is that the same Awan?

9   A.    Yes, I believe so, sir.

10  Q.    There's another individual in here.  I'm not going to

11  reveal his name.  There's another individual in here who is

12  really another principal in this.  And let's call him

13  Confidential Informant 2, all right, just to keep his name out

14  of this.  He was -- Mr. Wilson was a friend of this other

15  person; correct?

16  A.    I'm not sure I'm following who Confidential Informant

17  Person No. 2 is.

18  Q.    Informant No. 1 is your agent, your real agent; right?

19  A.    Right.

20  Q.    And Confidential 2 is the guy you caught in New Orleans on

21  his way to Mexico?

22  A.    Okay.  All right, sir.  Yes, sir.

23  Q.    And who turned him about six months ago; correct?

24  A.    I'm not familiar exactly with the time frame.  Right, but

25  we're talking about the same person, yes, sir.

1   Q.   So in relation to this other person that these

2   conversations with Awan and Somalia and taking a sailboat to

3   Somalia, all of that was -- that was way back when?  Do you

4   have an idea of about when that was?

5   A.   The sailboat conversations, I know, were not this current

6   year.  I believe it was 2011.

7   Q.   But No. 2, he got caught coming in from Canada also; is

8   that correct?

9   A.   I'm not sure, sir.  I'm not familiar with all the aspects

10  of the investigation, sir.

11  Q.   Okay.  But at some point in your conversation with

12  Mr. Wilson, he told you he completely abandoned that whole

13  Somalia idea as -- first of all, he didn't like the idea of

14  Muslims fighting Muslims; correct?

15  A.   I don't recall.

16  Q.   You can refresh your memory.

17  A.   In Somalia?

18  Q.   Well --

19  A.   Is your question about abandoning the idea -- well,

20  generally, yes, he abandoned this idea of going to Somalia with

21  that person.

22  Q.   And he, at one point, had discussed potentially going to

23  Egypt; correct?

24  A.   Yes, sir.

25  Q.   And taking -- and living there and doing what?

1    A.    He expressed interest in going to Egypt.  I think that's

2    when he met one of the other gentlemen that's referenced in the

3    interview.  Again, it was part of his idea of how he would go

4    overseas and live in an Islamic culture.  He also expressed how

5    he thought that --

6    Q.    Now, Daoud, the No. 1, the F.B.I. agent, it wasn't

7    happenstance that they met, was it?  I mean, you sent him into

8    that car lot to make contact with Mr. Wilson, didn't you?

9    A.    Well, I didn't, sir --

10   Q.    When I say "you," I mean the Government.

11   A.    But, generally, in investigations usually we have -- yes,

12   you have meets about how we go about -- we, as the F.B.I., go

13   about introducing people into an investigation to find out

14   things.

15   Q.    And that happened last year some time?

16   A.    I'm not exactly sure.

17   Q.    Within a year, like September, November of 2011?

18   A.    I don't know, sir.

19   Q.    Okay.  And in your statement, if you want to refer to it

20   at page 4, Mr. Wilson told you that his idea of jihad is

21   defending yourself if you're attacked or if others are

22   attacked, you'll go in and fight for them; is that fair to say?

23   A.    Yes, yes, sir.

24   Q.    And that's when the scenario came up about the U.S. troops

25   if he was somewhere -- if he was somewhere, he would defend

```
 1   whoever was being attacked; and if he felt they were being

 2   attacked unfairly by U.S. troops, he could see himself taking

 3   up arms?

 4   A.   Yes, sir.

 5   Q.   And he very specifically told you he's never even

 6   considered conducting a domestic attack.  Didn't he say that to

 7   you?

 8   A.   He talked about --

 9   Q.   Page 5.

10   A.   Yes.  He talked about considering it, but, yes, he was --

11   said that he -- yeah, he abandoned that idea, that that's

12   something he felt wouldn't be proper.

13   Q.   In fact, Wilson emphasized that he never had any idea or

14   intention to conduct a domestic attack.  That's what your

15   report says; right?

16   A.   Yes, sir.

17   Q.   And that he didn't have any kind of concrete plan in

18   place.  He told you that specifically when he spoke to you;

19   right?

20   A.   As far as traveling overseas, sir, that concrete plan?

21   Q.   Yes, sir.

22   A.   Yes, sir.

23   Q.   And in reference to the AK-47, in your statement it says

24   if Wilson -- if Wilson was in the situation and he believed it

25   was legitimate under Islam, he would be capable of picking up
```

```
 1   an AK-47 and fighting; is that fair to say?

 2   A.   Yes, sir.

 3   Q.   Or is your report wrong?

 4   A.   No, sir.  Everything -- that is correct.

 5   Q.   And he said he would pick the side he felt was right;

 6   correct?

 7   A.   Yes, sir.

 8   Q.   But it had to be justified from a religious standpoint; is

 9   that fair to say?

10   A.   Yes, sir.  From his interpretation, yes, sir.

11   Q.   And he told you, again, on the date of the statement that,

12   as recently as months, his evolving religious views -- his

13   religious views were evolving and things he felt months before

14   he no longer felt were justified; that he was -- that had to be

15   justified under the law of Islam.  Right?

16   A.   Yes, sir.

17   Q.   And he said that it's legitimate to spread Islam by the

18   sword but says that Islam says to spread it by authority and

19   not necessarily by killing.  He told you that; right?

20   A.   Yes, sir.

21   Q.   Now, I asked you earlier about the violent jihad.  I

22   noticed that in your statement it never said "violent jihad" in

23   any of those; it always said "jihad," right, in your statement?

24   You can review it if you want, but I'll represent to you that

25   it doesn't.
```

1   A.    That phrase, if it doesn't, sir, then I'll take that, yes,

2   sir.

3   Q.    And I asked you earlier in the statement that he gave you,

4   the written statement -- in fact, he -- when you pulled him in

5   there, he told you about No. 1 and No. 2 and the co-defendant.

6   He specifically mentioned to you the four people that he had

7   been involved in these discussions with, did he not?

8   A.    Yes.  Yes, sir.

9   Q.    And you surprised him by telling him that one of them was

10  an F.B.I. agent, didn't you?

11  A.    It was revealed to him.  He admitted he had suspicions and

12  things like that.

13  Q.    Did you reveal to him that No. 2 was also one of you guys?

14  A.    Yes, sir.  Yes, sir.

15  Q.    All right.  But at that time he actually was forthcoming

16  to you and told you what he knew.  And I asked you earlier

17  if -- in his statement his trip to Mauritania was to perform

18  his religious duty *le hajj,* which is migration, and asked him

19  about the violent jihad, and his statement -- which kind of

20  negates what you say.  You said that there was more in this

21  report, but there's not, is there, that supports what you say,

22  that --

23  A.    I don't understand what you're asking me, sir.

24  Q.    Where in your statement does it say he was going to go to

25  Mauritania to conduct violent jihad?  It doesn't, does it?

1    A.    Not Mauritania, sir, that's correct.

2    Q.    But he told you he was going to Mauritania?

3    A.    Yes, sir.

4    Q.    And, in fact, this statement wasn't the first statement

5    that he gave you, was it?  You gave him the statement and one

6    of you, either you or Agent Sorrells told him that that wasn't

7    enough and made him fill it out, and you made him give you more

8    information; is that fair to say?

9    A.    He did start that statement, sir.  We did read over it,

10   the beginning of it, and then he continued on with his

11   statement.

12   Q.    Okay.  And in the affidavit that is attached to the

13   complaint, Agent Sorrells' affidavit, I'll ask you and see if

14   you know, it says that Wilson was a close friend and a former

15   roommate of Omar Hammami.  He wasn't a former roommate of Omar

16   Hammami.  Where did you get that information?

17   A.    I don't know, sir.  I am familiar with the affidavit, sir,

18   so I know it says that.

19   Q.    Okay.  But the affidavit is basically that he's conspiring

20   to go somewhere to kill or maim or kidnap persons outside the

21   United States; is that --

22   A.    Yes, sir.

23   Q.    So you would agree that it's just an intangible?  He was

24   going to Mauritania, and he told you specifically he didn't

25   have any concrete plans other than the Mauritania?  You don't

```
1   have any foreign terrorist organization that he's linked with,

2   do you?

3   A.   No, sir.

4            MR. SOTO:  That's all I have, Judge.

5            THE COURT:  Okay.  Mr. Bodnar, does the Government

6   have any more questions for the agent?

7            MR. BODNAR:  Just real briefly, Your Honor.

8            THE COURT:  All right.

9            MR. BODNAR:  And, before I forget, we want to proffer

10  the complaint, which is the complaint affidavit which is

11  already part of the record here.

12

13                    REDIRECT EXAMINATION

14  BY MR. BODNAR:

15  Q.   Special Agent Green, one of the final things he asked you

16  was if Wilson specifically noted any designated foreign

17  terrorist organization that he was planning to join.  You said

18  no; right?

19  A.   Yes, sir.

20  Q.   Why was that that -- what was his explanation why there

21  was not just one group?

22  A.   Well, he explained that there were many and that he was

23  his own man, so he made up his own mind as to what groups he

24  would or would not support.  He explained how it would be tough

25  to travel somewhere and be accepted by a group as an unknown.
```

1    So that's why he didn't have a specific terrorist organization

2    that he was bent on going to.  It was more his general plan of

3    getting somewhere where he could feel an honorable Islamic duty

4    by participating in jihad.

5    Q.   And in his statement he does specifically mention a

6    location he planned to go to from Mauritania, doesn't it?

7    A.   I believe that was Mali.

8    Q.   Okay.

9    A.   Yes, sir.

10   Q.   And, again, from his statement and from what he told you

11   in the interview, why was he going on -- why was he about to

12   get on that flight to Morocco?

13   A.   He was getting on that flight so that he could fulfill his

14   plan of positioning himself to ultimately be a part of a jihad

15   movement.

16            MR. BODNAR:  Nothing further, Your Honor.

17            THE COURT:  Okay.  Mr. Soto, are you done with him?

18            Okay.  Agent Green, you may step down.

19            Mr. Bodnar, do you have anything else you'd like to

20   present?

21            MR. BODNAR:  Just argument, Your Honor.

22            THE COURT:  Okay.

23            MR. BODNAR:  Do you want us to go forth at this time?

24            THE COURT:  Yes.

25            MR. BODNAR:  Yes, Your Honor.  The statute has us

1    look at the nature and circumstances of this offense and

2    specifically notes terrorism in the statute, and this is a

3    terrorist offense.  This is an extremely serious offense.  I

4    know defense counsel makes it out to be this amorphous

5    conspiracy within a conspiracy, but that's exactly how Congress

6    has written it.  This is a conspiracy.

7           What he's charged with is the conspiracy to

8    materially support terrorists, 2339A, which requires a

9    predicate act, and one of the specifically listed predicate

10   acts within the statute is the 956A, the conspiracy to travel

11   overseas to kill, injure, maim, or damage property.  So he is

12   being charged with a conspiracy to materially support

13   terrorism, and the predicate there is conspiracy to kill.

14          Your Honor, the evidence is strong against him.  He's

15   basically admitted to all the elements in his statement and in

16   his interview.  He's been forthright in admitting that this is

17   what he's going for and this is what he's going to do.  While

18   he doesn't have any criminal history, Your Honor, he does have

19   ties to this community.  However, he is a flight risk.

20          In the facts in the proffered complaint, it talks

21   about him and his co-defendant, Mohammad Abukadair, how prior

22   to him and Abukdair going out to get passports, they

23   collaborated a plan, a lie for Abukdair, so they could obtain a

24   second passport.  So he's shown that he will -- that he's open

25   to agreeing to lying with others in order to obtain a passport.

1    We know that he was on the Jetway, about to board a

2    flight to an international location, Your Honor.  So there's an

3    incredible flight risk here.

4    As for danger to the community, he's admitted that he

5    was going overseas and he would take up arms with mujahideen,

6    Your Honor, and he specifically noted Mali, which is an area

7    that has significant terrorist fighting at this time.

8    In addition, back in December and January, the time

9    frame when he was trying to figure out how exactly to finance

10   this trip, Mr. Wilson was the one who put forward the ideas of

11   home invasions, burglaries here in this community in order to

12   get the money.  And, although those were ultimately not done,

13   those were his suggestions of how to obtain this money and

14   specifically identify targets, Your Honor.

15   Nothing further, Your Honor.

16   THE COURT:  Okay.  Mr. Soto.

17   MR. SOTO:  Judge, [unintelligible].  I have a

18   witness.

19   THE COURT:  We did.  That's fine.  I just wanted to

20   hear it.  Go ahead and put on your witness.  Who is your

21   witness?

22   MR. SOTO:  His grandmother.

23   THE COURT:  His grandmother.  Okay.  What's her name?

24   MR. SOTO:  Jeanna Weaver.

25   THE COURT:  Ms. Weaver, would you come up here,

```
 1   please, and be sworn in.

 2          THE CLERK:  Ma'am, would you raise your right hand.

 3

 4                          JEANNA WEAVER,

 5        called as a witness on behalf of the Defendant,

 6       having been first duly sworn, testified as follows:

 7

 8          THE COURT:  Okay.  Ma'am, just have a seat and adjust

 9   the microphone, and Mr. Soto will have some questions and then

10   the Government attorney will have some questions.

11          THE WITNESS:  All right.

12

13                       DIRECT EXAMINATION

14   BY MR. SOTO:

15   Q.   State your name, please.  State your name, please.

16   A.   Jeanna Weaver.

17   Q.   How do you spell your first name?

18   A.   J-E-A-N-N-A.

19   Q.   And, Ms. Weaver, you live in Mobile?

20   A.   Yes, ma'am -- yes, sir.

21   Q.   And how long have you lived there?

22   A.   All my life.

23   Q.   Okay.  And Randy Wilson is your grandson?

24   A.   Yes, he is.

25   Q.   So, obviously, you've known him all his life?
```

1    A.    All his life.

2    Q.    And where did he attend school?

3    A.    Different ones.  He was in the Islamic school in

4    Birmingham.  He come to Mobile and went to, I think, Simmons

5    Middle School.  And I don't know -- I don't know if he went

6    back to Birmingham after that.  I don't know if he went to high

7    school or not, but I think he got his GED, though.

8    Q.    Okay.  So you're familiar with his background?

9    A.    Oh, yeah.

10   Q.    Is he married?

11   A.    Yes, he is.

12   Q.    And how many children does he have?

13   A.    He has two.

14   Q.    How long has he been married?  When did they get married?

15   A.    About three -- about four years ago.

16   Q.    Okay.

17   A.    Three or four years old.  They have a three- and a

18   two-year-old.

19   Q.    And has he worked?

20   A.    Yes, sir.

21   Q.    Okay.  Where has he worked?

22   A.    He's had odd jobs.  He's worked at different places -- car

23   lot, hair place, just selling cell phones, and stuff like that.

24   Just different jobs.

25   Q.    Okay.  Well, he had a fragrance shop for a while, didn't

1  he?

2  A.    Yes, he did.

3  Q.    How did that come about?

4  A.    He researched it and thought it was a good idea.  And he

5  approached me about it, and I helped him finance it.

6  Q.    Okay.  And has he -- what kind of a -- what kind of a

7  childhood did he have?  Can you characterize his childhood for

8  us?

9  A.    Well, first five years he lived with -- first five years

10  of his life, he lived with me and my husband.  His mother had

11  drug problems.  And then she took him when he went into, you

12  know, kindergarten, and she took him to Birmingham.  And, you

13  know, he was there for a while.  Then he came back to Mobile.

14  But he's never been in trouble.  He's always been a good kid.

15  He's friendly.  Everybody likes him.

16  Q.    Okay.

17  A.    He's just -- you know.

18  Q.    When did he convert to Islam?

19  A.    Oh, that's been a while back.  It's been probably -- oh,

20  lord, 10, 12 years ago, maybe longer.

21  Q.    Okay.  And was there a point in his life when he became a

22  more serious --

23  A.    Oh, yes.

24  Q.    When did that happen?

25  A.    That happened about ten years ago.  He really started

1    practicing it.

2    Q.    And how old would that be?

3    A.    Pardon?

4    Q.    What do you mean?  Would he go --

5    A.    He would go to the mosque, you know.  And he would just --

6    you know, he had his friends that would be Muslim, and he was

7    just -- you know, he read the Qur'an and just was --

8    Q.    Did he speak Arab?

9    A.    He does some, yeah.

10   Q.    How did he do that?  How did he --

11   A.    He learned it from being around people that spoke Arabic.

12   Q.    Okay.  And you mentioned his children.  Is he close to his

13   children?

14   A.    Very close.

15   Q.    And is one of those children a special-needs child?

16   A.    Yes, it is.

17   Q.    And does he help take care of the --

18   A.    Oh, his son loves him dearly.  Randy is the only one who

19   can really control his son.  His wife had -- you know, they --

20   he's just -- he's close to his father, very close to his

21   father, and he's having problems now.

22   Q.    Is his wife -- I'm assuming his wife is also Muslim?

23   A.    Yes, she is.

24   Q.    Okay.  And do you have -- are you prepared, if the court

25   releases him into your custody, to make sure that he attends

```
 1   all court appearances?

 2   A.   Yes, sir.

 3   Q.   And does he have any employment that he can --

 4   A.   I'm sure he could find a job.

 5   Q.   You don't have a job for him?

 6   A.   Oh, I don't have one, no.  I work every day myself.

 7   Q.   You would make a place in your home for him and his

 8   children?

 9   A.   Yes, sir, most definitely.

10   Q.   Okay.

11   A.   In fact, he's lived off and on with me all his life.

12            MR. SOTO:  That's all I have.

13            THE COURT:  Okay.

14

15                     CROSS-EXAMINATION

16   BY MR. COSTELLO:

17   Q.   Good afternoon, Ms. Weaver.  I'm Sean Costello.  I have a

18   couple questions for you.

19   A.   Yes, sir.

20   Q.   Your grandson has not lived with you previously; is that

21   right?

22   A.   The last time he lived with me was when his wife was

23   pregnant with their first child, and, a little while after

24   that, they lived with me.  And then they moved out and got

25   their own apartment.
```

1   Q.   Okay.  So that was three years ago, four years ago?

2   A.   About four years ago because their son is three.  He'll be

3   four.

4   Q.   Okay.  And so is it fair to say that over the last three

5   or four years since he was living with you, you're not aware of

6   everything that he does every moment of the day?

7   A.   Not every moment of the day, but we're very close.  He

8   comes and visits me a lot.  And he comes to my job and, you

9   know, brings the children so I can see them because, like I

10  said, I work every day.

11  Q.   You mentioned that.  Where do you work?

12  A.   WalMart.

13  Q.   Okay.  And how often do you work?  What are your hours?

14  A.   Well, right now, I'm working like 30 hours a week.

15  Q.   Okay.  Is that during the day?  Is that in the evening?

16  A.   WalMart has their own way of putting a schedule.  You

17  might work 7:00 o'clock one morning and then 10:00 o'clock the

18  next day.  You just never know.  I have a schedule.  It changes

19  from day to day.  It's not --

20  Q.   So it's not set out?

21  A.   No.  It's not set, no.

22  Q.   And you also testified that your grandson opened a

23  fragrance shop; is that right?

24  A.   Yes, he did.

25  Q.   And you helped him finance that?

```
1    A.    Yes, I did.

2    Q.    All right.  And did he explain to you that one of the

3    reasons he might want to open that would be to throw off the

4    F.B.I.?

5    A.    Oh, no, sir.  No, no, no, no.

6    Q.    He didn't mention that to you?

7    A.    No.  He and his wife, we set down one day, and he was

8    telling me he got on the computer and, you know, he was just

9    checking out everything, making sure that it would be viable

10   to, you know, open up the shop.  And he thought it was a good

11   idea, and he seemed like he was gung-ho for it.

12         And, you know, I wanted to help him so he could help

13   take care of his family.  You know, he's always worked, but,

14   you know, it's just jobs here and there, you know.  But he's a

15   hard worker.

16         And, you know, he worked hard at the fragrance shop.

17   It just so happened, you know, it just wasn't enough customers

18   for it.  But he had it all set up.  I mean, I would go there

19   and check it out, and it would have all -- he would have all

20   kinds of fragrances and pretty bottles and incense and

21   everything.  I mean -- you know.  What money I gave him went to

22   the fragrance shop.

23   Q.    Okay.  Tell me, then, what you know about Mr. Mohammad

24   Abdul Rahman Abukdair.

25   A.    Not a thing.  I've met him one time.  That was it.
```

```
1    Q.    Really?

2    A.    Yep, one time.

3    Q.    So even though your grandson and he had been living

4    together recently, you only met him once?

5    A.    Well, yeah, just once.

6    Q.    Okay.  Even though he was a partner in the fragrance shop

7    that you were financing?

8    A.    You know, I didn't know anything about him.  I mean, to

9    me, he was just a good Muslim.

10   Q.    Okay.  And I presume, then, that your grandson told you

11   about his trip that he was planning overseas; right?

12   A.    Yeah.

13   Q.    You also mentioned that he has a son with special needs;

14   is that right?

15   A.    Yes, he does.

16   Q.    And did he explain about how taking this special-needs son

17   of his to Mauritania would help him?

18   A.    Well, they were going to go over there so that they could

19   be in a Muslim country where he could, you know, learn the

20   language better and raise his children and, you know, just be a

21   good Muslim.  That's it.  He wanted to be a good Muslim.

22         He wanted to study and to, you know -- you know, when

23   you -- I mean, here in America, of course, there's not -- you

24   know, there's Muslims, but over there, there's more Muslims.

25   And he could study and learn all they know.
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

```
 1            You know, when Randy gets something in his head, I
 2   mean, he's -- I mean, he just, you know, takes everything to
 3   heart.  And when he became a Muslim, he was truly a Muslim.  He
 4   practiced what he preached.  He didn't just, you know --
 5   Q.   He was very serious about it?
 6   A.   He was very serious about it.
 7   Q.   Once he's got something in his mind, he's going to do it?
 8   A.   Well, you know, he was a Muslim, and nobody could tell
 9   him -- I'm Christian.  I'm Christian.  And, you know, because
10   he's a Muslim -- his mother is a Muslim.  His brother and his
11   sister are born and raised Muslim.  And, you know, I love them
12   all.
13            And, Randy, I've had him -- like I said, I've raised
14   him from the time he's little.  He's never been in trouble.  He
15   was always just -- he loves me, and I love him and we talk.
16   We're close.
17            And, as far as all this stuff that went on, I don't
18   know anything about it.  You know, this comes as a shock to me.
19   Q.   So you don't know anything about any of this?
20   A.   No.  When he told me he was going over there, it was to
21   take his family so that they could be there and raise their
22   children to be good Muslims.
23   Q.   So he kept a good chunk of this stuff hidden from you;
24   right?
25   A.   Well, you know, I don't believe anything until it's proven
```

1   to me, you know.  And all I know is my grandson is a good

2   person.  He wouldn't harm nobody.  I know that.  I've seen

3   him -- I've never seen him angry.  I've never seen him get

4   upset.  I mean, he's the most calm, collected person I ever

5   met.

6           And, like I say, he loves his grand -- his nanny.

7   And if anything was going to go on, I would have known it

8   because, like I said, we're close.

9           You know, I think Randy just had Muslim friends, and

10  maybe some of them talked a big talk.  But, you know, when you

11  have -- when you talk the talk, you know -- I don't think that

12  Randy would ever, you know, have done anything.  I mean, his

13  friends might have talked it, but, you know, he's not a leader.

14  He follows sometimes.  But Randy would never harm anybody

15  because I know.  I asked him to put a dog to sleep one time.

16  He couldn't even harm the dog.

17  Q.   So it might be some of his friends, like Mr. Abukdair, who

18  you don't know?

19  A.   Like I said, I don't know many of his friends.  I mean,

20  most of the time, it's just him, his wife, and two kids.  You

21  know, they visited.  They came.  We talked.  They stayed for a

22  long time, and we just -- you know.  I never knew anything

23  about these people.

24          I mean, the ones you're talking about, I don't know.

25  Like I said, I've met this guy that he opened the shop up one

1  time, and he bought a hamburger from his sister and that's the

2  only time I ever seen him.

3  Q.   Okay.  Thank you.

4  A.   You're welcome.

5          THE COURT:  Ms. Weaver, who else lives in the house

6  with you?

7          THE WITNESS:  Ma'am?

8          THE COURT:  Who else lives in the house with you?

9          THE WITNESS:  Right now, my daughter.  She's got her

10 trailer out back.  His mother.  His mother is there with me.

11 We're in the process of getting her moved into her own house.

12 In fact, she's got everything moved out already, just about.

13 So, you know, she's getting there.

14         THE COURT:  So, ma'am, it's just you?

15         THE WITNESS:  It's going to be me, yes.

16         THE COURT:  And you said you work about 30 hours a

17 week, but you don't know your schedule?

18         THE WITNESS:  Yes, ma'am.  I work about 30 -- after

19 the holidays, I want to go back to 28 because I draw widow's

20 benefits, and, you know, once I get a certain --

21         THE COURT:  You can't --

22         THE WITNESS:  So I have to pay the Government back.

23 I don't want to work more than I have to.  Plus, I'm retired.

24 I'm 63, soon to be about 64.  I got about one more year to work

25 and I'm retiring.  I'm quitting.

```
1              THE COURT:  Okay.

2              THE WITNESS:  Give it up.  And I can stay home and

3    take care of whatever needs I need.

4              And, you know, Randy would be a lot of help if he was

5    living with me.

6              THE COURT:  Okay.  Let me --

7              THE WITNESS:  We're very close, and we live out in

8    the woods.

9              THE COURT:  Let me ask you, do you have a landline

10   phone --

11             THE WITNESS:  Yes.

12             THE COURT:  -- like in-the-wall phone?

13             Do you have anything else, Mr. Soto?

14             MR. SOTO:  No, sir -- ma'am.

15             THE COURT:  Thank you, ma'am.  You can return back to

16   your seat.

17             MR. SOTO:  That's all I have, Judge.

18             THE COURT:  Okay.  You want to make your argument

19   since I overstepped?

20             MR. SOTO:  Yes.  Judge, I put them down, and I'll

21   just very briefly go over them.

22             THE COURT:  Right.  I've read it.

23             MR. SOTO:  And, basically, what this is, is, with all

24   due respect to the Government, it's, at best blush, a bunch of

25   guys talking smack over a long period of time.  And, by the
```

1   agent's own testimony, there's nothing concrete, other than he

2   was going to take his family to Mauritania.  And what this is,

3   essentially, is an attempted conspiracy to commit a conspiracy.

4           I've set out the law, as far as material support

5   requires.  I've also cited a case that's -- as far as the

6   contention -- my contention is that a lot of this is free

7   speech that's covered under the First Amendment and may even

8   extend to freedom of religion as far as being able to go to

9   Mauritania and this whole -- all of the explanations of what

10  these -- what these -- what "jihad" really means and all these

11  other terms really mean.

12          But the statements in the affidavit are kind of

13  amorphous.  If you look at them, some of them are incorrect.

14  Some of them use weasel words that they put so-and-so and

15  so-and-so said or it was discussed.  And so we really -- when

16  you're looking at the reality of this case, it's probably not

17  going to get tried real soon because there's going to be a

18  challenge on the Constitutional grounds as far as -- for things

19  like I just mentioned.

20          It would be a shame to put somebody away on something

21  as amorphous of "I intend to go somewhere to practice my

22  religion and if something happens, I might do something."

23  That, I don't think is the kind of knowing that the statute

24  calls for.

25          And I'd ask you to consider -- consider his

```
1   background, that he is from Mobile, he's -- and he's told -- he
2   told the agents, "Back in my time, I did some stuff.  I did
3   some drugs."  He told Pretrial, "I did do drugs.  I didn't do
4   them recently."  And I always have this problem with Pretrial
5   because you say you admit to things you did in Pretrial, they
6   always come back to haunt you; if you lie about them, they come
7   back to haunt you.  Naturally, they should.  He hasn't done any
8   of that in a while.
9           And he -- and by the agent's own admission, a lot of
10  this talk is historical in nature.  He abandoned all of that
11  Somalia.  It was just young guys talking smack.  They put an
12  agent in there.  And I submit that why they put that agent in
13  there was that Hammami, who is this kid from Daphne, running
14  around doing all this crazy stuff back there, he puts a bead on
15  Mobile.  In addition, the person who you're talking about,
16  about No. 2, he is Hammami's buddy and he gets caught and he
17  turns.  So they sent an agent in here to infiltrate.
18          He has -- my client has been on the Internet.  And,
19  now, with the Internet, everybody thinks that you're somehow
20  anonymous.  I don't know why you think that because you are a
21  direct line to every F.B.I. agent posing as a girl or posing as
22  a terrorist or keeping tabs on terrorists, et cetera.
23          I'd like to submit to the court, and I know -- you
24  know, when I first started looking at this, I thought I was
25  swimming up a waterfall, but I really don't think that I am.  I
```

1  think that given what you have before you, even the agent's

2  testimony, I think this young man should be allowed out on

3  bond, especially given the fact that this case may drag on a

4  long time.

5          And I would like to give you the affidavit that was

6  submitted in a case in Boston with a guy named Tarek Mehanna.

7  And in Tarek Mehanna's case, the circumstances were much more

8  egregious.  The gentleman ended up getting 200-something years

9  because he was connected to terrorist groups.  But he was out

10 on bond.  And I know that, here, we have a tendency to,

11 perhaps, to err on the side of not letting people out, but this

12 is not a presumption case.

13         And you have before you the grandmother who has told

14 you, "Look, I'll take care of him.  He has never been in

15 trouble."  The idea that he could abscond when he's having to

16 scrounge money to take his family elsewhere, if you look at the

17 affidavit, there's no money here.  These guys are scrounging

18 money to get together to take their family somewhere else.

19         They have his passport; the F.B.I. has his passport.

20 He cannot leave.  There are conditions, less -- there are

21 conditions that are less restrictive than putting this young

22 man in jail for probably another two years while he waits for a

23 trial.

24         THE COURT:  Okay.  Thank you.

25         Anything else from the Government, Mr. Bodnar?

```
 1              MR. BODNAR:  Your Honor, I can't speak about the
 2    Tarek Mehanna affidavit out of Boston.  I'm just not familiar
 3    with it there --
 4              THE COURT:  Is that the case where one of the
 5    defendants -- the judge found that the defendant had abandoned
 6    the conspiracy, so he let him out on conditions?
 7              MR. SOTO:  I don't know, Judge.  I've got, like, 20
 8    of these cases swirling around.  I've become an expert in the
 9    last three weeks.
10              THE COURT:  Same here.  I had read several before
11    taking the bench.  That's all right.  I was just going to ask
12    that.
13              Okay.  Mr. Bodnar --
14              Yes, sir?
15              MR. SOTO:  But in every one of those cases, if you'll
16    look where these things are charged, you know, whether it's A
17    or B.
18              THE COURT:  Right.
19              MR. SOTO:  The circumstances are allowing -- even the
20    detentions have been where someone is sending some money and
21    someone is going off.  They are actually overseas and in these
22    training camps and all these things.  There's nothing here.
23    There's nothing here, other than some amorphous intention to go
24    somewhere and maybe do something.
25              I'm sorry.  I don't mean to interrupt.
```

47

```
1              THE COURT:  It's okay.

2         Mr. Bodnar.

3         MR. BODNAR:  Your Honor, this is not an amorphous

4    plan to maybe go over and maybe do something.  He was arrested

5    as he was boarding the first leg of an international flight

6    which was taking him to Casablanca, Morocco where he was going

7    to meet his co-defendant, Mr. Abukdair, in Morocco where he

8    believed he was meeting two other individuals, the ones we've

9    been referring to as 1 and 2, to travel to Mauritania.

10             And then he told you in a statement that's been

11   spoken about by the agent that he was planning to go to Mali

12   and take up arms; that while it was not a plan of "we're going

13   to go on this date from Mauritania into Mali," that's just not

14   how these things work, Your Honor.  He would get over there and

15   make the necessary contacts, but he's been very clear about

16   what his intentions were.

17             In addition, Your Honor, he had violent tendencies

18   when he was here, back in December and January when he was

19   planning out various different ways in which he can gain money

20   for this trip.

21             Your Honor, his prior record, according to Pretrial,

22   is not very good either.  I'm looking at page 2 here, from 2007

23   to '11, he had nine traffic citations.  In the Middle East,

24   traffic citations are not the most serious things; however, he

25   failed to appear on seven occasions.  So he doesn't have a good
```

1   track record.

2           In addition, Your Honor, much of what can be done in

3   the jihadi community can be done from your home, meeting with

4   people online.  Putting him on home detention or home

5   monitoring is just not sufficient in this case, Your Honor.

6   This is not a "Maybe we'll make a plan to do something one

7   day"; this is "We're going overseas to Africa to be positioned

8   so that we can join the conflict when the time is right."

9           The plan is to go for jihad.  The specifics of

10  exactly when to get there or exactly how they're going to get

11  there or who to join to be hammered out once they got there

12  because you can't know that stuff from here, Your Honor.

13          THE COURT:  Okay.  All right.  Well, under the Bail

14  Reform Act, I'm required to consider certain factors,

15  18 U.S.C. 3142.  I'll start with the history and

16  characteristics of the individual.  He does report -- I think

17  you're right, Mr. Soto, maybe his last use was in 2007 of some

18  social alcohol and some marijuana.  Nothing that would give me

19  pause on that.

20          No mental health issues.

21          He does have ties to the community.

22          Financial resources, clearly he doesn't have any.

23  I'm not sure about the grandmother.  She had stated on the

24  stand she financed his unsuccessful attempt at the men's

25  fragrance store.  So there was apparently some there.

```
 1            His employment, he had no employment.  And employment
 2   history has been rather tenuous.  He's got no real stable
 3   employment history.
 4            Then I come to the other factors which are more
 5   persuasive.  The weight of the evidence, as laid out by the
 6   agent and contained in the complaint, I find that it is strong
 7   and it's not just an amorphous sort of crime that's been
 8   alleged.  And, mainly, the overwhelming factor that I find is
 9   the nature and the circumstances of the crime, the providing
10   the material support to terrorists.
11            Again, what I've heard from the agent contained in
12   the affidavit in support of the complaint -- I will set this
13   out, Mr. Soto, in more detail in my order -- is to find that
14   the Government has shown by clear and convincing evidence that
15   there are no conditions that I can implement that will ensure
16   the safety of the community and that by a preponderance of the
17   evidence there are no conditions that I can set or combination
18   of conditions to ensure he'll return back to this court if
19   ordered.
20            Again, I'll set it out.  You'll have time to appeal
21   my decision to the district judge, but my order today is that,
22   based on what I've heard and based on my consideration of the
23   factors, I'm going to find him detained pending the
24   presentation of this complaint to the Grand Jury.
25            Anything for the Government, Mr. Bodnar?
```

1          MR. BODNAR:  No, Your Honor.

2          THE COURT:  Mr. Soto?

3          MR. SOTO:  No.  Are we still on --

4          THE COURT:  As far as I know.  The preliminary

5   hearing is still set for December the 27th.

6          MR. SOTO:  Okay.

7          THE COURT:  All right.  Thank you.

8          MR. SOTO:  Yes, ma'am.

9          MR. BODNAR:  Thank you, your Honor.

10      [Recess.]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   STATE OF ALABAMA)
                    :
2   COUNTY OF MOBILE)

3

4          I, Melanie Wilkins, do hereby certify that the above

5   and foregoing transcript of proceedings in the matter

6   aforementioned was taken by me in machine shorthand, and the

7   questions and answers thereto were reduced to writing under my

8   personal supervision using computer-aided transcription, and

9   that the foregoing represents a true and correct transcript of

10  the proceedings upon said hearing.

11

12         I further certify that I am neither counsel nor

13  related to the parties to the action, nor am I in anywise

14  interested in the result of said cause.

15

16

17
                            s/Melanie Wilkins, RMR,CRR
18                          Melanie Wilkins
                            Registered Merit Reporter
19                          Certified Realtime Reporter
                            Official Court Reporter
20                          United States District Court
                            Southern District of Alabama
21                          113 St. Joseph Street
                            Mobile, Alabama  36602
22                          (251) 690-3371

23

24

25