FILED IN OPEN COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

APR 19 2013

CHARLES R. DIARD, JR.
CLERK

UNITED STATES OF AMERICA           )
                                   )
v.                                 )      CRIMINAL NO.  12-00293-KD
                                   )
RANDY LAMAR WILSON, JR., *a.k.a.*, )
     RASHEED WILSON                )

## PLEA AGREEMENT

The defendant, **RANDY LAMAR WILSON, JR,** *a.k.a.* **RASHEED WILSON**, represented by his counsel, and the United States of America have reached a plea agreement in this case, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.      The defendant understands his rights as follows:

    a.      To be represented by an attorney;

    b.      To plead not guilty;

    c.      To have a trial by an impartial jury;

    d.      To confront and cross-examine witnesses and to call witnesses and produce other evidence in his defense; and

    e.      To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.      The defendant waives rights b through e, listed above, and pleads guilty to Count One of the indictment charging a violation of Title 18, United States Code, Section 2339A (conspiracy to provide material support to terrorists).

Rev. 07/10

3.     The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.     The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.     The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.     The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant his understanding of the United States' evidence and the law as it relates to the facts of his offense.

7.     The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

8.     A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual

Resume is true and correct.  Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

9.    This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement.  There have been no promises from anyone as to the particular sentence that the Court will impose.  The defendant is pleading guilty because he is guilty.

10.   The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter.  This waiver includes, but is not limited to, rights under the Freedom of Information Act, the Privacy Act of 1974, and Federal Rules of Criminal Procedure 16 and 26.2. The United States will continue to provide information pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and pursuant to 18 U.S.C. § 3500 (the Jencks Act) and *Giglio v. United States*, 405 U.S. 150 (1972) as it relates to only sentencing.

## PENALTY

11.   The maximum penalty the Court could impose as to Count One of the indictment is:

a.    15 years imprisonment;

b.    A fine not to exceed $250,000;

c.    A term of supervised release of 3 years, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release,

he could be imprisoned for the entire term of supervised release;

d.   A mandatory special assessment of $100.00; and

e.   Such restitution as may be ordered by the Court.

## SENTENCING

12.   The Court will impose the sentence in this case.  The United States Sentencing Guidelines are advisory and do not bind the Court.  The defendant has reviewed the application of the Guidelines with his attorney and understands that no one can predict with certainty what the sentencing range will be in this case until after a pre-sentence investigation has been completed and the Court has ruled on the results of that investigation.  The defendant understands that at sentencing, the Court may not necessarily sentence the defendant in accordance with the Guidelines.  The defendant understands that he will not be allowed to withdraw his guilty plea if the advisory guideline range is higher than expected, or if the Court departs or varies from the advisory guideline range.

13.   The defendant understands that this Plea Agreement does not create any right to be sentenced in accordance with the Sentencing Guidelines, or below or within any particular guideline range, and fully understands that determination of the sentencing range or guideline level, or the actual sentence imposed, is solely the discretion of the Court.

14.   The United States will provide all relevant sentencing information to the Probation Office for purposes of the pre-sentence investigation.   Relevant sentencing information includes, but is not limited to, all facts and circumstances of this case and information concerning the defendant's conduct and background.

15.    The defendant agrees that the sentencing enhancement in United States Sentence Guidelines § 3A1.4 applies to this case.

16.    Both the defendant and the United States are free to allocute fully at the time of sentencing.

17.    The defendant agrees to tender $100.00 to the U.S. District Court Clerk in satisfaction of the mandatory special assessments in this case.  The United States reserves the right to withdraw any favorable recommendations it may agree to within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## UNITED STATES' OBLIGATIONS

18.    The United States will not bring any additional charges against the defendant related to the facts underlying the Indictment.  This agreement is limited to the United States Attorney's Office for the Southern District of Alabama and does not bind any other federal, state, or local prosecuting authorities.

19.    The United States will recommend to the Court that the defendant be sentenced to 180 months in prison.

## APPLICATION OF U.S.S.G. § 5K1.1 AND/OR FED.R.CRIM.P. 35

20.    The defendant understands and agrees that he has no right to cooperate, and that the decision whether to allow him to cooperate is reserved solely to the United States in the exercise of its discretion.

21.    If the United States agrees to allow the defendant to cooperate, and if the defendant agrees to cooperate, the following terms and conditions apply:

a.    The defendant shall fully, completely, and truthfully respond to all questions put to him by the United States and any other agency designated by the

United States regarding the underlying facts of the offense(s) with which he is charged, as well as the underlying facts of any criminal offense(s), state or federal, of which he has information or knowledge.

b.      The defendant acknowledges that he understands that he shall provide truthful and complete information regarding any offense about which he has knowledge or information regardless of whether he is questioned specifically about any such offense. This provision requires the defendant to divulge all information available to him even when those questioning him do not know about the defendant's involvement, knowledge or information relating to any particular offense. This requirement extends to any and all persons about whom the defendant has such knowledge or information.

c.      The defendant agrees to cooperate completely with all authorities in any matters to which his cooperation may be deemed relevant by the United States. The defendant agrees to fully comply with all instructions from the United States regarding the specific assistance he shall provide. This includes, but is not limited to, consenting to monitored and/or recorded telephone conversations, participating in undercover operations, testifying completely and truthfully before any grand jury, at any pre-trial proceeding, during any trial, and any post-trial proceeding.

d.      The defendant agrees to turn over to the United States any and all documents, tapes and other tangible objects which are in his possession or under his control and which are relevant to his participation in and knowledge of criminal activities, regardless of whether it relates to the charged offense. This obligation is a continuing one and includes materials that the defendant may acquire, obtain or have access to after the execution of this agreement.

e.    The defendant also agrees to identify the assets of any other person which were obtained through or facilitated the defendant's illegal activities or the illegal activities of another.

f.    If the defendant provides full, complete, truthful and substantial cooperation to the United States, which results in substantial assistance to the United States in the investigation or prosecution of another criminal offense, a decision specifically reserved by the United States in the exercise of its sole discretion, then the United States agrees to move for a downward departure in accordance with Section 5K1.1 of the United States Sentencing Guidelines or Rule 35 of the Federal Rules of Criminal Procedure, whichever the United States deems applicable.  The United States specifically reserves the right to make the decision relating to the extent of any such departure request made under this agreement based upon its evaluation of the nature and extent of the defendant's cooperation.  The defendant understands that the United States will make no representation or promise with regard to the exact amount of reduction, if any, the United States might make in the event that it determines that the defendant has provided substantial assistance. The defendant understands that a mere interview with authorities does not constitute substantial assistance.  The defendant also understands that, should he provide untruthful information to the United States at any time, or fail to disclose material facts to the United States at any time, or commits a new criminal offense, the United States, in its sole discretion, may not make a motion for downward departure.

g.   The United States and the defendant agree that any breach of this agreement by the defendant, including but not limited to committing a new offense, failing to cooperate, intentionally withholding information, giving false information, committing perjury, failing to identify assets obtained by him from his illegal activities or obtained by others associated with him or of which he has knowledge, or refusing to testify before the grand jury or at any judicial proceeding, would:

(1)   permit the United States to reinstate and proceed with prosecution on any other charges arising from the matters underlying the Indictment; and

(2)   permit the United States to initiate and proceed with the prosecution on any other charges arising from a breach of this agreement. The United States will not be limited, in any respect, in the use it may make against the defendant of any information provided by the defendant during his breached cooperation. Such breach will constitute a waiver of any claim the defendant could make under the United States Constitution, the Federal Rules of Evidence, the Federal Rules of Criminal Procedure, or any statute or case law by which the defendant seeks to suppress the use of such information or any evidence derived from such information.

h.   Nothing in this agreement shall protect the defendant in any way from prosecution for any offense committed after the date of this agreement, including perjury, false declaration, false statement, and obstruction of justice, should the defendant commit any of these offenses during his

cooperation.  The defendant acknowledges and agrees that the information that he discloses to the United States pursuant to this agreement may be used against him in any such prosecution.

  i.  The United States and the defendant agree that the defendant will continue his cooperation even after he is sentenced in the instant matter.  His failure to continue his cooperation will constitute a breach of this agreement, and the defendant agrees that under such conditions, the United States will be free to reinstate the charges and the prosecution of the charges in the Indictment, which are to be dismissed in accordance with this agreement.  Under these circumstances, the defendant expressly waives any rights he may have under the statute of limitations and the speedy trial provisions.

22.  The determination of whether a defendant's cooperation warrants a sentencing reduction recommendation rests solely with the United States.

## LIMITED WAIVER OF RIGHT TO APPEAL AND WAIVER OF COLLATERAL ATTACK

23.  As part of the bargained-for exchange represented in this plea agreement, and subject to the limited exceptions below, the defendant knowingly and voluntarily waives the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.  Accordingly, the defendant will not challenge his guilty plea, conviction, or sentence in any district court or appellate court proceedings.

  a.  **EXCEPTIONS.**  The defendant reserves the right to timely file a direct appeal challenging:

       (1)     any sentence imposed in excess of the statutory maximum;

       (2)     any sentence which constitutes an upward departure or variance from the advisory guideline range.

The defendant also reserves the right to claim ineffective assistance of counsel in a direct appeal or § 2255 motion.

24.    If the United States files a notice of appeal of the sentence imposed in this case and such appeal is authorized by the Solicitor General, the defendant is released from the appellate waiver with respect to the sentence imposed in this case.

25.    The defendant further reserves the right to timely move the district court for an amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive amendment to the Sentencing Guidelines which would affect the sentence.

26.    If the defendant receives a sentence within or below the advisory guideline range, this plea agreement shall serve as the defendant's express directive to defense counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by the defendant.

27.    By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or attack his conviction, either on direct appeal or collaterally, on the ground that the United States failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

28.    If the defendant has previously entered a guilty plea pursuant to this Agreement, defendant will not be able to withdraw the guilty plea.

## VIOLATION OF AGREEMENT

29.     The defendant understands that if he breaches any provision of this Plea Agreement, the United States will be free from any obligations imposed by this agreement, but all provisions of the agreement remain enforceable against the defendant.  In the exercise of its discretion, the United States will be free to prosecute the defendant on any charges of which it has knowledge.  In such event, the defendant agrees not to assert any objections to prosecution that he might have under the Sixth Amendment and/or Speedy Trial Act.

30.     In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## ENTIRETY OF AGREEMENT

31.     This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.


Respectfully submitted,
KENYEN R. BROWN
UNITED STATES ATTORNEY


Date:  4/19/13


John G. Cherry
Assistant United States Attorney
Chief, Criminal Divison

Date: 4/18/13

Christopher J. Bodnar
Assistant United States Attorney

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

Date: 4/19/13

Randy Lamar Wilson, Jr., *a.k.a.*, Rasheed Wilson
Defendant

I am the attorney for the defendant. I have fully explained his rights to him with respect to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein, with the defendant and to my knowledge, his decision to stipulate to the facts is an informed, intelligent and voluntary one.

Date: 4/19/13

Domingo Soto
Counsel for Defendant

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 12-00293-KD |
| | ) | |
| RANDY LAMAR WILSON, JR., *a.k.a.*, | ) | |
| RASHEED WILSON | ) | |

### FACTUAL RESUME

The defendant, **RANDY LAMAR WILSON, JR.,** *a.k.a.*, **RASHEED WILSON** admits the allegations of Count One of the indictment.

### ELEMENTS OF THE OFFENSE

**WILSON** understands that in order to prove a violation of Title 18, United States Code, Section 2339A, as charged in Count One of the superseding indictment, the United States must prove:

First:    Wilson agreed with at least one other person to accomplish a shared and unlawful plan; to wit, to provide material support or resources, in the form of themselves as personnel;

Second:    Wilson knew the unlawful purpose of the plan and willfully joined in it; and

Third:    Wilson knew or intended that the material support or resources were to be used in preparation for, or to carry out, a violation of 18 U.S.C. § 956(a), which prohibits conspiring to murder, maim, or kidnap persons in a foreign country.

### OFFENSE CONDUCT

Defendant **RANDY LAMAR WILSON, JR.,** *a.k.a.*, **RASHEED WILSON**, admits in open court and under oath that the following statement is true and correct and constitutes evidence in this case. This statement of facts is provided solely to assist the Court in determining whether a factual basis exists for **WILSON's** plea of guilty. The statement of facts does not contain each and every fact known to **WILSON** and to the United States concerning the defendant's involvement in the charges set forth in the plea agreement.

From at least September, 2011 through December 11, 2012, defendant **RANDY LAMAR WILSON, JR.,** *a.k.a.,* **RASHEED WILSON** knowingly and willfully conspired with co-defendant Mohammad Abdul Rahman Abukhdair, and with others both known and unknown to the Grand Jury, to provide material support and resources, including property, services, and personnel, including themselves, knowing and intending that they were to be used in preparation for, and in carrying out, a violation of Title 18, United States Code, Section 956(a) (conspiracy to kill, maim, or injure persons or damage property in a foreign country).

## I.    The Conspirators' Understanding of Jihad

The term jihad has multiple meanings, and not all meanings involve violence. However, when Wilson and Abukhdair discussed traveling overseas for jihad, they meant a very specific thing. To them, jihad equates to an actual violent fight in which people are injured and die. Below are a few demonstrative examples in which they explain their understanding of jihad:

- On April 12, 2011, Wilson explained to a friend that the mujahideen who engage in violent jihad will receive the greatest reward after they die. During the course of this conversation, the friend asked Wilson, "*And jihad is. . . .?*" to which Wilson responded, "*qital = fighting akhi, with guns and bombs and the hard stuff. It's hard and that's why the reward is the greatest.*"

- On November 1, 2011, Abukhdair explained to Wilson and the UCE that: "*MashaAllah, I think, I think the problem is, people don't understand that, uh, jihad means people are going to die . . . . It's a war yani. Why are you getting angry at so and so. This is what jihad is. This is what war is.*"

- On November 9, 2011, during a meeting between Wilson, Abukhdair, and the UCE, Wilson described jihad as a war between Muslims and the kufars, *i.e.*, the non-believers. Wilson explained, "*It's not a small war anymore. It's either we're gonna kill them and defeat them, or they're gonna kill us and defeat us.*"

-       On February 3, 2012, Abukhdair suggested conducting a domestic terrorist attack by taking hostages and demanding the release of Sheik Omar Abdel-Rahman[1] and Aafia Siddiqui.[2]  If their demands were not met, Abukhdair explained that, *"well at the very least, we kill them all."*  After the UCE and Wilson rejected this idea in favor of continuing on with the original conspiracy, Abukhdair lamented, *"I don't know if you guys understand the greatness of a jihad operation in the United States, man."*

## II.      Facts Proving the Existence of the Conspiracy and Wilson's Intent

### A.      Select Events During 2010

Wilson and Abukhdair met in early 2010.  At the time, Wilson lived in Mobile, Alabama and Abukhdair lived in Alexandria, Egypt.  By late 2010, Wilson and Abukhdair began discussing their shared goal of traveling to a foreign country to wage violent jihad.  The conspiracy began in or around October 2010.

During a conversation on October 7, 2010, Abukhdair asked Wilson about his connection with Omar Hammami, the international terrorist from Daphne, Alabama.[3]  At that time, both Wilson and Abukhdair knew that Hammami was a prominent figure in al-Shabaab; a federally designated terrorist organization in Somalia with links to al-Qaeda.  Wilson explained that Hammami *"was my roommate and we grew up together."*  Thereafter, Abukhdair told Wilson he wanted to go to Somalia

---

[1]      Sheik Omar Abdel-Rahman, *a.k.a.*, "The Blind Sheik," is the alleged mastermind of the 1993 World Trade Center Bombing.  In 1995, he was convicted of several charges and sentenced to life in prison.

[2]      Aafia Siddiqui was an MIT-educated Pakistani cognitive neuroscientist.  She allegedly had handwritten notes and a computer thumb-drive, which contained bomb-making instructions, when she was arrested in Afghanistan in 2008. While in custody, she grabbed an unattended rifle and began shooting at her interrogators.  She was subsequently convicted of assault with intent to murder her interrogators and sentenced to 86 years in prison.

[3]      Daphne native Omar Hammami traveled to Somalia in 2006 where he joined al-Shabaab.  On February 26, 2008, the United States Secretary of State designated al-Shabaab as a Foreign Terrorist Organization.  Hammami has been indicted on terrorism charges in the Southern District of Alabama.  On November 14, 2012, Hammami was placed on the FBI's "Most Wanted Terrorists" list.

Rev. 07/10                                             3

for "*tourism*." Wilson noted, "*It's not easy to get there now*," but explained, "*That's my plan too*." Wilson told Abukhdair that he wanted to take his family with him, but if that was not possible, that would not stop him. He then explained to Abukhdair: "*There are different ways [of getting into Somalia]. Most of the foreign brothers just cross the border from Kenya. Once you're in Somalia they will know what to do with you. The mujahideen[4] control the entire border*."

Wilson and Abukhdair initially wanted to go to Somalia for jihad. However, they realized that getting into Somalia was both difficult and dangerous. Thus, from the very beginning of their conspiracy, they sought a place where they could successfully wage violent jihad without being arrested first, even if that meant going somewhere other than Somalia. For example, on October 12, 2010, Wilson asked Abukhdair if he thought about going anywhere else to wage jihad. Abukhdair responded, "*Like where Akhi?[5] Are there easier places? I feel like Somalia is the easiest place*." Wilson replied, "*The Earth is a battlefield, Akhi. Yemen, Mauritania, these places*." Wilson reiterated his pragmatic and opportunistic approach to finding a suitable location for jihad on October 27, 2010 when he explained to Abukhdair, "*SubhanAllah. Just remember Akhi, the world is a battlefield. Jihad is not restricted to any particular land. Allah will make a way for you*."

In late November 2010, Abukhdair and his roommates were arrested by Egyptian authorities due to supposed connections to terrorist activities in Egypt. He was imprisoned in Egypt for nearly two months before he was deported to the United States on January 14, 2011.

## C.    Select Events During 2011

Throughout 2011, Wilson and Abukhdair meticulously analyzed dozens of foreign locations as possible travel destinations. Their primary focus was on finding: (1) countries in which violent

---

[4]    Mujahideen means "fighter" in Arabic. In a conversation on April 14, 2011, Wilson explained to a friend that mujahideen means "*someone who fights jihad*."

[5]    Akhi means "brother" in Arabic.

jihad was already being waged, or countries in which they believed violent jihadist fronts would soon emerge, and (2) countries that did not have on-going jihadist violence, but from which Wilson and Abukhdair could easily travel to other countries that did have current or emerging violent jihadist fronts.   They also carefully considered other variables, such as the ease of getting into particular countries and the likelihood of being arrested before being able to wage violent jihad.   In addition, Wilson and Abukhdair frequently discussed how best to disguise the true purpose of their travel. Several concealment options were repeatedly discussed and analyzed, including traveling under the guise of being tourists, pretending to be traveling to study, or using enrollment in an Arabic institution as cover.   These discussions continued on a near daily basis throughout 2011.   Below are some of many examples of these conversations:

- On May 7, 2011, Abukhdair suggested traveling to Sudan rather than Mauritania. However, Wilson noted, *"The problem with Sudan is you might get arrested, because it's a transit point to the front lines."* Abukhdair added, *"Ya.   They had a place there.   A school to memorize the Quran and it was sending people to Somalia."*

- On July 4, 2011, Wilson and Abukhdair discussed numerous travel options including, Mauritania, Egypt, Sudan, Yemen, Saudi Arabia, Tanzania, Jordan, Eritrea, Algeria, and Somalia. During the course of the conversation, Wilson explained, *"I'm trying to put some kind of list of options together.   The important thing to remember is that we have to be practical.   After we get somewhere, then we can think about other things."*

- On August 2, 2011, Wilson and Abukhdair discuss the possibility of traveling to Pakistan, Egypt, Algeria, and Jordan.   With regard to the Jordanian option, Abukhdair noted that there was a *"70 percent chance of going to jail."* Wilson explained, *The thing is me and you wherever we go we going to keep a low key and not put ourselves in position to be arrested inshaAllah."*

- On September 23, 2011 Wilson and Abukhdair discussed traveling to either Sudan or Mauritania.  With regard to Sudan, Abukhdair noted that *"we need a reason to go"* because *"'Tourism' doesn't cut it in a place like Sudan."*  In response, Wilson suggested, *"Well we can say we are coming to apply for the Islamic university there . . . . or to study Arabic.  Anything."*

- On September 30, 2011, while continuing to analyze Sudan as a possible travel destination, Abukhdair told Wilson he had a friend who *"was in Sudan and he said they have a Quran school that takes brothers to nice tourism places."*

- On October 2, 2011, Wilson explained to the UCE that the advantage of going to Sudan was its proximity to other areas that he believed might emerge as the next jihadist front. Wilson explained *"you cannot always make it to places like that.  I'm talking about Somalia, not Sudan.  To be honest with you, things are heating up in Egypt and something is gonna happen there . . . . So at least if something happened, you're gonna be close to some events."*

Later in this same conversation, Wilson explained the advantage of going to interim locations like Mauritania or Sudan, as opposed to Egypt: *"That's why we were trying to go to Mauritania first. But Mauritania, you just land and that's it.  If you get out of the airport, nobody gonna know about you.  No visa means anything, what are they gonna do, because people are living in huts man, in the desert.  Nobody's gonna find you.  But in Egypt, it's so easy to catch you, so if the United States wants you, they can just get you.  But a place like Sudan or Mauritania or some of those poorer countries, it's easy to keep yourself safe, so, you know what I'm saying?"*

- On October 11, 2011, while analyzing where to go, Wilson explained to Abukhdair, *"If we think about it seriously, this is what it boils down to.  Jordan is easy, but dangerous and expensive.  Mauri is cheap, but probably hard to get a visa for, and Sudan is hard to get a visa for and we don't know a lot about it."*

- On October 15, 2011, Wilson explained to Abukhdair why he believed a location in North Africa would be the best travel option: "*Akhi, look. What we need to really think about is this. We need to place ourselves somewhere close to where 'it' is happening, but isn't happening there yet. And everything we would be able to reach at this stage points to the Maghreb.[6] I like Jordan a lot, but I heard it's really dangerous right now. . . . I like Morocco, Algeria and Tunis to be honest. Akhi, the reason why is Libya is looking interesting, Morocco I think will follow, and did you see the videos from Tunis? . . . . Bro, to be honest, I like Tunis. The reason why is that I think we could easily get in and it borders Libya, and I'm sure it's easy to cross the border without problems right now . . . . Bro, I'm telling you. What we want to do in the future, the Maghreb is perfect, because the other places we cannot reach, as far as I know. . . . Plus, when things become unstable, and they will, no one is going to tell us to leave.*

- On November 9, 2011, Abukhdair told Wilson and the UCE that they should rule out Kenya as a possible travel destination. Although Kenya shares a lengthy border with Somalia, Abukhdair noted that Kenya was a predominantly Christian country and no one would believe they were really going there to study Islam.

Another major event in 2011 was Abukhdair's move to Mobile to live with Wilson and his family. The purpose of having Abukhdair move down to Mobile was so that Wilson and Abukhdair could work out specific details of their conspiracy in person.

## C.   Select Events in 2012

In early 2012, Wilson, his family, and Abukhdair all applied for and received United States passports. However, on February 4, 2012, Wilson and Abukhdair believed they identified an FBI surveillance vehicle. That same night, Wilson and Abukhdair threw their computers and other electronic devices into Mobile Bay.

---

[6]   The Maghreb is a traditional term for northwest Africa, and usually refers to the countries of Libya, Tunisia, Algeria, Morocco, Mauritania, and Western Sahara.

Due to the possibility of FBI surveillance, Wilson and Abukhdair told the UCE that they would not be traveling at this time, but that they still intended to travel overseas at a later date. On February 23, 2012, Wilson told the UCE, "*I think eventually we're cool, everything will be ok. But I don't think it's a good idea [to travel] now.*" Abukhdair suggested that they may need to wait up to a year before it was safe for them to travel.

Rather than traveling in early 2012, Wilson and Abukhdair opened a men's fragrance store, which was in operation from approximately the end of March 2012 through June 2012. The purpose of opening the fragrance store was to make the FBI believe that they had abandoned their conspiracy. This is evident from a September 7, 2012 conversation in which Wilson told the CHS about how he and Abukhdair believed they were followed by the FBI, which they attributed to the FBI believing that they were about to leave the country. According to Wilson, after they opened the fragrance store, the surveillance stopped. The CHS noted that the FBI must have thought they abandoned their travel plans since they opened the fragrance store. Wilson agreed and explained:

| | |
|---|---|
| Wilson: | *Yeah. That was my main reason for opening the store, to be honest with you.* |
| CHS: | *Dude. You're frickin' smart dude.* |
| Wilson: | *Well. Well, it was a bunch of money, but you know.* |
| CHS: | *But it was worth it for you.* |
| Wilson: | *It was . . . yeah.* |
| CHS: | *Yeah, at least they can stop bothering you, so.* |
| Wilson: | *Yeah. And it worked.* |

On October 12, 2012, Wilson and the CHS discuss the "*situation*" in Mali, and Wilson explained how weapons were being stockpiled there. Later during this conversation, Wilson told the CHS that the real reason for going to Mauritania was to get into neighboring Mali:

CHS:        *Look at Omar [Hammami].  Omar got into Somalia before it hit the fan.*

Wilson:     *Yeah.*

CHS:        *That's what you gotta do.*

Wilson:     *Different world, different world.*

CHS:        *Yeah.*

Wilson:     *That's my point.*

CHS:        *You see what I'm saying?*

Wilson:     *You're not getting nowhere now.   We have to —*

CHS:        *[UI] Somalia, yeah.*

Wilson:     *— you have to wait.*

CHS:        *Yeah.*

Wilson:     *You have to wait for it to [UI]*

CHS:        *[UI] so going to the place before it starts, be there and then [UI]*

Wilson:     *And there's already something going on —*

CHS:        *Hell yeah.*

Wilson:     *— next door.*

CHS:        *[UI]*

Wilson:     *See?*

CHS:        *Yeah.*

Wilson:     *Trust me man, this is all the things —*

CHS:        *[UI] Ok*

Wilson:     *— I thought about.  You see —*

CHS:        *[UI] Let's not, let's not —*

Wilson:     *You see where I'm going with this now?*

CHS:        — get distracted brother.  I didn't even think about that.

Wilson:     *Yeah.*

CHS:        *Cause it, I think brothers get too friggin' caught up in like, oh, I gotta be in this area right here.*

Wilson:     *Yeah.*

CHS:        *I gotta be in the Pakistani border, you know because that's when they get caught.*

Wilson:     *[UI] see?  Listen.  That is [UI] have to have connections.*

CHS:        *[UI]*

Wilson:     *And people who don't have connections try to make connections and that's how they get busted.*

CHS:        *That's how they get caught.  So these people you're talking to now in Mauritania, you trust them?*

Wilson:     *Oh yeah.  And I don't talk about the main thing.*

CHS:        *Ok.*

Wilson:     *You know what I'm saying?*

CHS:        *So basically they're —*

Wilson:     *[UI] It's just like, hey man, I wanna come and live with my family, I need —*

CHS:        *Ahhh.*

Wilson:     *— a school to send my kids to.*

CHS:        *Ok, this is our story until we get there.*

Wilson:     *[UI] I need to, I need to use, I need to learn Arabic.*

CHS:        *Yeah, once we get there —*

Wilson:     *Yeah.*

CHS:        *— we need to make connections in Mali and stuff like that.*

Wilson:     *Alright.  You see the point?*

| CHS: | *Yeah.* |
|------|---------|
| Wilson: | *Trust me. I've been thinking about this for like, four months.* |
| CHS: | *Nice.* |
| Wilson: | *Everyday.* [Laughter] *That's how I came up with all these ideas.* |
| CHS: | *It's pretty damn smart.* |

On December 11, 2012, Wilson was arrested in Atlanta Hartsfeld Airport as he attempted to board a flight for the first leg of his trip to Mauritania. In an interview following his arrest, Wilson made a written statement in which he admitted that one of his intentions in traveling to Mauritania was to be in a position to fight jihad, possibly in Mali. He noted that he had similar intention since 2009, and admitted he had also considered going to Somalia for jihad.

### III.    Wilson's Knowledge of the Illegality of the Conspiracy

At all times relevant to this conspiracy, Wilson was aware that the actions their actions were illegal. As he explained to Abukhdair on April 27, 2011, *"The thing is akhi, I've read almost every indictment from brothers arrested, so I have a pretty good idea what gets you arrested . . . . The ones who are arrested are the ones who tried to travel to Somalia or whatever, or people who planned on committing terrorism here."*

AGREED TO AND SIGNED.

Respectfully submitted,
KENYEN R. BROWN
UNITED STATES ATTORNEY

Date: ___4 / 19 / 13___

John C. Cherry
Criminal Chief

Date: _____

Christopher J. Bodnar
Assistant United States Attorney


Date: _____

Randy Lamar Wilson, Jr., *a.k.a.*, Rasheed Wilson
Defendant


Date: _____

Domingo Soto
Attorney for Defendant