1          IN THE UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF ALABAMA

3                   SOUTHERN DIVISION


4    ------------------------------------
                                        ) CRIMINAL NO. CR12-00293
5    UNITED STATES OF AMERICA,          ) COURTROOM 5A
                                        ) U.S. FEDERAL COURTHOUSE
6                                       ) MOBILE, ALABAMA
     VS.                                ) APRIL 19, 2013
7                                       )
     RANDY LAMAR WILSON,                )
8                                       )
                   DEFENDANT.           )
9    ------------------------------------)


10


11                CHANGE OF PLEA HEARING

12        BEFORE THE HONORABLE KRISTI K. DuBOSE

13          UNITED STATES DISTRICT COURT JUDGE

14   APPEARANCES:

15   FOR THE GOVERNMENT:    Christopher John Bodnar, Esq.
                            Sean P. Costello, Esq.
16                          Assistant U.S. Attorney
                            U.S. Attorney's Office
17                          63 South Royal Street, Suite 600
                            Mobile, Alabama  36602
18
     FOR DEFENDANT WILSON:
19
                            Domingo Soto, Esq.
20                          Madden & Soto
                            465 Dauphin Street
21                          Mobile, Alabama  26602

22   COURT REPORTER:        Melanie Wilkins, RMR, CRR
                            Official Court Reporter
23                          113 St. Joseph Street
                            Mobile, Alabama  36602
24                          (251) 690-3371
                            stenomel@gmail.com
25

1            Proceedings reported by machine stenography.

2               Transcript produced by computer.

3        [April 19, 2013, 10:23 a.m.  The defendant is present with

4        counsel in open court.]

5            THE CLERK:  We are on the record for a change of plea

6   hearing in Criminal No. 12-293, United States of America versus

7   Randy Lamar Wilson, Jr.

8            What says the Government?

9            MR. BODNAR:  Ready, Your Honor, to proceed.

10           THE CLERK:  And the defendant?

11           MR. SOTO:  Ready, Your Honor.

12           THE COURT:  Make sure his microphone is on.

13           MR. SOTO:  Yes, ma'am, it's on.

14           THE COURT:  Mr. Wilson, if you would raise your right

15   hand, please, sir.

16       [Duly sworn.]

17           THE COURT:  Okay.  Sir, if you would move forward so

18   I can make sure I hear everything you say.  I need to ask you

19   some questions to determine whether this is a competent plea

20   and this is a voluntary plea.  If you would state your full

21   name.

22           THE DEFENDANT:  Randy Lamar Wilson, Jr.

23           THE COURT:  How old are you?

24           THE DEFENDANT:  Twenty-six.

25           THE COURT:  How far did you go in school?

1          THE DEFENDANT:  Tenth grade.

2          THE COURT:  Can you read, write, and understand the

3   English language?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  Have you had any problems communicating

6   with your attorney?

7          THE DEFENDANT:  No, ma'am.

8          THE COURT:  Did he explain the charge to you?

9          THE DEFENDANT:  Yes, ma'am.

10         THE COURT:  Are you fully satisfied with his advice

11   and his representation?

12         THE DEFENDANT:  Yes, ma'am.

13         THE COURT:  Have you ever been treated for any type

14   of mental illness?

15         THE DEFENDANT:  No, ma'am.

16         THE COURT:  Have you ever been treated for drug

17   addiction?

18         THE DEFENDANT:  No, ma'am.

19         THE COURT:  Are you currently under the influence of

20   any type of drug, alcohol, or medication?

21         THE DEFENDANT:  No, ma'am.

22         THE COURT:  Now, you are pleading pursuant to a plea

23   agreement.  Did you read that plea agreement and discuss it

24   with your attorney before you signed it?

25         THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  And the plea agreement provides that in

2    return for your guilty plea to Count 1, the Government is going

3    to recommend a sentence of 15 years.  Is that the way you

4    understand it?

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  The plea agreement also provides that if

7    you choose to cooperate and the Government decides that you

8    have provided substantial cooperation that they'll ask me to go

9    below the guidelines that are applicable to your case.  Do you

10   understand that?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  Have you gone over those guidelines with

13   your attorney?

14         THE DEFENDANT:  Yes, ma'am.

15         THE COURT:  And do you understand those are just

16   advisory and I'm not required to follow those?

17         THE DEFENDANT:  Yes, ma'am.

18         THE COURT:  Do you also understand that I'm not

19   required to follow the plea agreement that you've entered into?

20         THE DEFENDANT:  Yes, ma'am.

21         THE COURT:  Has anybody promised you anything

22   different than what's included in that plea agreement?

23         THE DEFENDANT:  No, ma'am.

24         THE COURT:  Has anyone tried to force you to plead

25   guilty?

1                    THE DEFENDANT:  No, ma'am.

2                    THE COURT:  Now, the plea agreement also provides

3    that you are waiving your right to appeal the sentence that I

4    give you.  Do you understand that?

5                    THE DEFENDANT:  Yes, ma'am.

6                    THE COURT:  That means you cannot file a direct

7    appeal or a collateral appeal.  Do you understand?

8                    THE DEFENDANT:  Yes, ma'am.

9                    THE COURT:  It means that when you leave this

10   courtroom, the sentence I give you is the sentence you'll be

11   serving.  Do you understand that?

12                   THE DEFENDANT:  Yes, ma'am.

13                   THE COURT:  The only exception is if I go above the

14   guidelines, if I go above the statutory maximum, or you receive

15   ineffective assistance of counsel.  Do you understand?

16                   THE DEFENDANT:  Yes, ma'am.

17                   THE COURT:  You are pleading to a felony offense.

18   You lose the right to vote, the right to hold public office,

19   and the right to possess a firearm.  Do you understand?

20                   THE DEFENDANT:  Yes, ma'am.

21                   THE COURT:  Now, the possible penalties in your case

22   are up to 15 years in prison, $250,000 fine, three years

23   supervised release, and $100 special assessment.  Those are the

24   maximum penalties.  Do you understand?

25                   THE DEFENDANT:  Yes, ma'am.

1          THE COURT:  Now, as I told you, there are sentencing

2  guidelines that apply to your case.  Do you understand that?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Now, you have a right to continue in your

5  plea of not guilty.  We would have a trial.  At trial, you

6  would be presumed innocent.  The prosecutor would have to prove

7  your guilt beyond a reasonable doubt.  At trial, you would have

8  the right to cross-examine the witnesses.  You'd have the right

9  to have assistance of counsel.  You'd have the right to compel

10 witnesses to attend the trial on your behalf.  You would also

11 have the right to either choose to testify or not testify.  If

12 you chose not to testify, that fact could not be used against

13 you.

14          But do you understand by pleading guilty today, you

15 are giving up those rights?

16          THE DEFENDANT:  Yes, ma'am.

17          THE COURT:  There will not be a trial; do you

18 understand?

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  Is that what you want?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  All right.  If the Government would give

23 me the elements and the facts.

24          MR. BODNAR:  Yes, Your Honor.  The defendant, Randy

25 Lamar Wilson, Jr. a.k.a., Rasheed Wilson, is pleading guilty to

1   Count 1, which a violation of Title 18, United States Code,

2   2339A, conspiracy to provide material support to terrorists.

3         To prove these counts, the United States would first

4   have to prove that the defendant agreed with at least one other

5   person to accomplish a shared and unlawful plan; to wit, to

6   provide material support or resources, in the form of

7   themselves as personnel;

8         Second, that Wilson knew the unlawful purpose of the

9   plan and willfully joined in it;

10         And, third, that Wilson knew or intended that the

11   material support or resources were to be used in preparation

12   for, or carrying out, a violation of 18 U.S.C. Section 956(a),

13   which prohibits conspiring to murder, maim, or kidnap persons

14   in a foreign country.

15         The United States would prove that from at least

16   September 2011 through December 11th, 2012, the defendant,

17   Randy Lamar Wilson, knowingly and willfully conspired with his

18   co-defendant, Mohammad Abdul Rahman Abukdair, and with others

19   both known and unknown to the Grand Jury, to provide material

20   support and resources, including property, services, and

21   personnel, including themselves, knowing and intending that

22   they were to be used in preparation for, or in carrying out, a

23   violation of Title 18, United States Code, Section 956(a),

24   which is conspiracy to kill, maim, or injure persons or damage

25   property in a foreign country.

1    The first section, "The Conspirators' Understanding

2  of Jihad."  The term "jihad" has multiple meanings, and not all

3  meanings involve violence.  However, when Wilson and Abukdair

4  discussed traveling overseas for jihad, they meant a very

5  specific thing.  To them, jihad equates to actual violence and

6  fighting in which people are injured and die.  There are a few

7  demonstrative examples in which they explain their

8  understanding of "jihad."  We pulled a few.

9    April 12th, 2011, Wilson explained to a friend that

10  *mujahideen* who engage in violent jihad will receive the

11  greatest reward after they die.  During the course of that

12  conversation, the friend asked Wilson, "And jihad is?"  To

13  which Wilson responded, *"Qital* equals fighting, *akhi*, with the

14  guns and the bombs and the hard stuff.  It's hard, and that's

15  why the reward is the greatest."

16    On November 1, 2011, Abukdair explained to Wilson and

17  to the UCE, which is the undercover F.B.I. agent, *"MashaAllah*,

18  I think -- I think the problem is that people don't understand

19  that jihad means people are going to die.  It's a war *yani*.

20  Why are you getting so angry at so-and-so?  This is what jihad

21  is.  This is what war is."

22    On November 9th, 2011, again, during a meeting

23  between Wilson and Abukdair and the UCE, Wilson described jihad

24  as a war between the Muslims and the *kufars*, the nonbelievers.

25  Wilson explained that, "This is not a small war anymore.  It's

```
1   either we're gonna kill them and defeat them or they're gonna

2   kill us and defeat us."

3           And, finally, on February 3rd, 2012, Abukdair

4   suggested to the UCE and to Wilson about conducting a domestic

5   terrorist attack by taking hostages and demanding the release

6   of Sheik Omar Abdel-Rahman, The Blind Sheik, and of Aafia

7   Siddiqui.  If their demands were not met, Abukdair explained,

8   "Well, at the very least, we'll kill them all."  After the UCE

9   and Wilson rejected the idea in favor of continuing on with the

10  original conspiracy, Abukdair lamented.  "I don't know if you

11  guys understand the greatness of the jihad operation in the

12  United States, man."

13          Facts proving the existence of a conspiracy and

14  Wilson's intent --

15          THE COURT:  If you'll stop there.  All right.

16  Mr. Wilson, do you agree that the Government could prove that

17  when you used the term "jihad," you were referring to violent

18  jihad, to maim and murder?

19          THE DEFENDANT:  Yes, ma'am.

20          MR. BODNAR:  These are selected, then, from 2010,

21  Your Honor.  Wilson and Abukdair met in early 2010.  At the

22  time Wilson was living here in Mobile, Alabama, and Abukdair

23  was living in Alexandria, Egypt.  By late 2010, Wilson and

24  Abukdair began discussing their shared goal of traveling to a

25  foreign country to wage violent jihad.  The conspiracy began in
```

1   or around October of 2010.

2          In an early conversation from October 7, 2010,

3   Abukdair asks Wilson about his connection with Omar Hammami,

4   the international terrorist from Daphne, Alabama.  At the time

5   both Wilson and Abukdair knew that Hammami was a prominent

6   figure in al-Shabaab, a federally designated terrorist

7   organization in Somalia.  And Wilson explained that Hammami

8   "was my roommate" and that they grew up together.  Thereafter,

9   Abukdair told Wilson that he wanted to go to Somalia for

10   "tourism."  Wilson noted, "It's not easy to get there right

11   now," but explained that's my plan, too.

12          Wilson told Abukdair that he wanted to take his

13   family there, but, if that wasn't possible, it wouldn't stop

14   him.  He then explained to Abukdair, "There are different ways

15   of getting into Somalia.  Most of the foreign brothers just

16   cross the border from Kenya.  Once you are in Somalia, they'll

17   know what to do with you.  The *mujahideen* control the entire

18   border."

19          Wilson and his family -- Wilson and Abukdair

20   initially wanted to go to Somalia for jihad.  However, they

21   realized that getting into Somalia was both difficult and

22   dangerous.  Thus, from the beginning of their conspiracy, they

23   sought a place where they could successfully wage violent jihad

24   without being arrested first, even if that meant going

25   somewhere else other than Somalia.

1           On October 12th, 2010, Wilson asked Abukdair if he

2    thought about other places to wage jihad.  "Like where, Akhi?

3    Are there easier places?  I feel like Somalia is the easiest

4    place."  Wilson replied, "The Earth is a battlefield, *Akhi*.

5    Yemen, Mauritania, these places."

6           Wilson reiterated his pragmatic and opportunistic

7    approach to finding a suitable location for jihad on

8    October 27th, 2010, when he explained to Abukdair,

9    "SubhanAllah.  Just remember, *Akhi*, the world is a battlefield.

10   Jihad is not restricted to any particular land.  Allah will

11   make way for you."

12          In late November 2010, Abukdair and his roommates

13   were arrested by Egyptian authorities due to supposed

14   connections to terrorist activities in Egypt.  He was

15   imprisoned in Egypt for nearly two months before he was

16   deported back to the United States on January 14, 2011.

17          We move to selected events from 2011, Your Honor.

18          Throughout 2011 Wilson and Abukdair meticulously

19   analyzed dozens of foreign locations as possible travel

20   destinations.  Their primary focus was on finding countries in

21   which, one, violent jihad was already being waged or countries

22   in which they believed violent jihadist fronts would soon

23   emerge, or, two, countries that did not have ongoing jihadist

24   violence, but from which Wilson and Abukdair could easily

25   travel to other countries that did have current or emerging

1    violent jihadist fronts.

2            They also considered other variables, such as ease of

3    getting into a particular country and the likelihood of being

4    arrested before being able to wage violent jihad.  In addition,

5    Wilson and Abukdair frequently discussed how best to disguise

6    the true purpose of their travel.  Several concealment options

7    were repeatedly discussed and analyzed, including traveling

8    under the guise of being tourists, pretending to be traveling

9    to study, and using enrollment in an Arabic institution as a

10   cover.

11           These discussions continued on a near daily basis

12   throughout 2011.  I pulled out samples for you.  On May 7th,

13   2011, Abukhdair suggested traveling to Sudan rather than

14   Mauritania.  However, Wilson noted, "The problem with Sudan is

15   you might get arrested because it's a transit point to the

16   front lines."  Abukdair added, "Ya.  They had a place there, a

17   school to memorize the Quran, and they're sending people to

18   Somalia."

19           On July 4th, 2011, Wilson and Abukdair discussed

20   numerous travel options including Mauritania, Egypt, Sudan,

21   Yemen, Saudi Arabia, Tanzania, Jordan, Eritrea, Algeria, and

22   Somalia.  During the course of the conversation, Wilson

23   explained, "I'm trying to put together some kind of list of

24   options.  The important thing to remember is that we have to be

25   practical.  After we get somewhere, then we can think about

other things."

On August 2nd, 2011, Wilson and Abukdair discuss the possibility of traveling to Pakistan, Egypt, Algeria, and Jordan.  With regard to the Jordanian option, Abukdair noted that there's a 70 percent chance that we're going to jail.  Wilson explained, "The thing is, me and you, wherever we go, we going to keep a low key and not put ourselves in position to be arrested."

On September 23rd, 2011, Wilson and Abukdair discussed traveling to either Sudan or Mauritania.  With regard to Sudan, Abukdair noted, "We need a reason to go" because "tourism doesn't cut it in a place like the Sudan."

In response, Wilson suggested, "Well, we can say that we're coming to apply to a foreign Islam university there or to study Arabic.  Anything."

On September 30th, 2011, while continuing to analyze Sudan as a possible travel destination, Abukdair told Wilson he had a friend who "was in Sudan and he said they have a Quran school that takes brothers to nice tourism places."

On October 2nd, 2011, Wilson explained to the UCE that the advantage of going to Sudan was its proximity to other areas that he believes might emerge as the next jihadist front.  Wilson explained, "You cannot always make it to places like that.  I'm talking about Somalia, not Sudan.  To be honest with you, things are heating up in Egypt and something is gonna

1    happen there.  So at least if something happens, then you're

2    gonna be close to some events."

3            Later in the same conversation, Wilson explained the

4    advantage of going to interim locations like Mauritania and

5    Sudan, as opposed to Egypt.  "That's why we're going to go to

6    Mauritania first.  But Mauritania, you just land and that's it.

7    If you get out of the airport, nobody is going to know about

8    you.  No visa means anything, what are they going to do because

9    people are living in huts, man, in the desert.  Nobody is going

10   to find you.  But in Egypt, it's so easy to catch you.  So if

11   the United States wants you, they can just get you.  But a

12   place like Sudan or Mauritania or some of those poorer

13   countries, it's easy to keep yourself safe.  So you know what

14   I'm saying?"

15           On October 11th, 2011, while analyzing where to go,

16   Wilson explained to Abukdair, "If we think about it seriously,

17   this is what it boils down.  Jordan is easy but dangerous and

18   expensive.  Mauri is cheap but probably hard to get a visa for

19   and Sudan is hard to get a visa for and we don't know a lot

20   about it."

21           On October 15th, 2011, Wilson explained to Abukdair

22   why he believed a location in North Africa would be the best

23   location.  "*Akhi*, look.  What we really need to think about is

24   this.  We need to place ourselves somewhere close to where 'it'

25   is happening, but isn't happening there yet.  And everything we

1    would be able to reach at this stage points to the *Maghreb*."

2            The *"Maghreb"* is the traditional term for northwest

3    Africa, which usually refers to the countries of Libya,

4    Tunisia, Morocco, Mauritania, and Western Sahara.

5            "I like Jordan a lot," said Wilson, "but I heard it's

6    really dangerous right now.  I like Morocco, Algeria, and

7    Tunis, to be honest.  *Akhi*, the reason why is Libya is looking

8    interesting.  Morocco, I think, will follow.  Did you see those

9    videos from Tunis?  Bro, to be honest, I like Tunis.  The

10   reason why is I think we could easily get in, and it borders

11   Libya.  And I'm sure it's easy to cross the border without

12   problems right now.  Bro, I'm telling you.  What we want to do

13   in the future, the *Maghreb* is perfect, because the other places

14   we can't reach, as far as I know.  Plus, when things become

15   unstable, and they will, no one is going to tell us to leave."

16           On November 9th, 2011, Abukdair told Wilson and the

17   UCE that they should rule out Kenya as a possible destination.

18   Although Kenya shares a lengthy border with Somalia, Abukdair

19   noted that Kenya was a predominantly Christian country and no

20   one would really believe they were going to study Islam there.

21           Another major event in 2011 was Abukhdair's move to

22   Mobile to live with Wilson and his family.  The purpose of

23   having Abukdair to move to Mobile was so that Wilson and

24   Abukdair could work out specific details of their conspiracy in

25   person.

1            Your Honor, we move to 2012 now.  In early 2012,

2   Wilson and his family and Abukdair all applied for and received

3   United States passports.  However, on February 4th, 2012,

4   Wilson and Abukdair believed they identified an F.B.I.

5   surveillance vehicle.  That same night Wilson and Abukdair

6   threw their computers and other electronic devices into the

7   Mobile Bay.

8            Due to the possibility of F.B.I. surveillance, Wilson

9   and Abukdair told the UCE that they would not be traveling at

10  this time, but that they still intended to travel overseas at a

11  later date.  On February 23rd, 2012, Wilson told the UCE, "I

12  think eventually we're cool; everything will be okay.  But I

13  don't think it's a good idea to travel now."  Abukdair

14  suggested that they may need to wait up to a year before it was

15  safe for them to travel.

16           Rather than traveling in early 2012, Wilson and

17  Abukdair opened a men's fragrance store, which was in operation

18  from approximately the end of March 2012 through June of 2012.

19  The purpose of opening the store was to make the F.B.I. believe

20  that they had abandoned their conspiracy.  This is evident from

21  a September 7th, 2012, conversation in which Wilson told the

22  CHS about how he and Abukdair believed they had been followed

23  by the F.B.I., which they attributed to the F.B.I. believing

24  that they were about to leave the country.

25           According to Wilson, after opening the fragrance

1    store, the surveillance stopped.  The CHS noted that the F.B.I.

2    must have thought that they abandoned their travel plans since

3    they opened the fragrance store.

4            Wilson agreed and explained.  And there's a

5    conversation out there, Your Honor, in which Wilson explains

6    that the reason he opened the store, to be honest, was to throw

7    off the F.B.I. and that it had, in fact, worked.

8            On October 12th 2012, Wilson and the CHS discussed

9    the "situation" in Mali.  Wilson explained how weapons were

10   being stockpiled there.  Later during the conversation, Wilson

11   told the CHS that the real reason for going to Mauritania was

12   to get into Mali.

13           Your Honor, then there's a conversation printed out

14   between Wilson and the CHS which, in summary, is the two of

15   them talking about the true purpose of going to Mauritania in

16   which Wilson explains he has not told his contacts in

17   Mauritania what they truly intend to do.  He's just talking to

18   them about where to send his kids to school and get enrolled in

19   the Islam university, that the plans are to get there and then

20   find a way to get to Mali.

21           On December 11th, 2012, Wilson was arrested at the

22   Atlanta Hartsfeld-Jackson Airport as he attempted to board a

23   flight on the first leg of the trip to Mauritania.  In the

24   interview Wilson made a written statement in which he admitted

25   that one of his intentions in traveling to Mauritania was to be

1   in a position to fight jihad, possibly in Mali.  He noted that

2   he had similar intentions since 2009, and admitted that he had

3   also considered going to Somalia for jihad.

4          Finally, the last section, Your Honor, is Wilson's

5   knowledge of the illegality of his conspiracy.  At all times

6   relevant to this conspiracy, Wilson was aware that his actions

7   were illegal.  As he explained to Abukdair on April 27th, 2011,

8   "The thing is, *Akhi*, I've read almost every indictment from

9   brothers arrested, so I have a pretty good idea what gets you

10  arrested.  The ones who are arrested are the ones who tried to

11  travel to Somalia or whatever, or people who planned on

12  committing terrorism here."

13         THE COURT:  Mr. Wilson, do you agree that the

14  Government could prove those facts against you?

15         THE DEFENDANT:  Yes, ma'am.

16         THE COURT:  And you had an opportunity to go over

17  that -- those facts, you read them in court with your attorney

18  before you got here today?

19         THE DEFENDANT:  Yes, ma'am.

20         THE COURT:  So you looked at them in detail?

21         THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  And you agree he could prove that?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  And you agree that he could also prove,

25  as a result of those facts, that you did involve yourself and

1   participate in a conspiracy to murder, maim, or kidnap persons

2   in foreign countries?

3           THE DEFENDANT:  Yes, ma'am.

4           THE COURT:  How do you plead?

5           THE DEFENDANT:  Guilty.

6           THE COURT:  It's the finding of the court in the case

7   of the United States versus Randy Lamar Wilson that the

8   defendant is fully competent and capable of entering an

9   informed plea.  The defendant is aware of the nature of the

10  charges and the consequences of the plea.  The plea of guilty

11  is a knowing and voluntary plea supported by an independent

12  basis in fact containing each of the essential elements of the

13  offense.  The plea is accepted, and you're hereby adjudicated

14  guilty of Count 1.

15          Yes, sir.

16          MR. SOTO:  Just wanted to add a couple of things, if

17  I could?  And that is in your recitation of what the plea

18  agreement is, we are free to elocute for a lesser sentence than

19  15 years, according to the plea agreement, A.

20          And, B, just so that the court is aware, you'll

21  notice that there's a waiver of the Rule 16 provision in there.

22  We've had discussions.  The plea agreement isn't something that

23  we just pasted together spontaneously.  We've gone through

24  getting this plea agreement together, and the plea agreement

25  contains a waiver of the Rule 16 responsibilities that the

1   Government has, primarily because -- since it's just going to

2   be about sentencing, we didn't think that the Government had to

3   go through the whole procedures of FISA and CIPA and all that

4   stuff just to give us stuff that we're due.  On the other hand,

5   the Government -- we've reached agreement with the Government

6   that they understand they still have responsibilities to give

7   us --

8            THE COURT:  Any mitigating evidence.

9            MR. SOTO:  Yes, ma'am.  And that it's just broader

10  than *Brady* and *Giglio*, depending on what the PSR says, that

11  it's going to be broader than that.  They understand that.  We

12  have had communications.  I don't know if the court wants us to

13  go further into that.  We can.  I want to make sure that you

14  understand that.

15           MR. BODNAR:  Yes, Your Honor.  We've had those

16  conversations.

17           THE COURT:  And, along those lines, the normal

18  sentencing order will go out.  I ask that any evidence that you

19  want to submit or that you want to submit, for instance, tapes,

20  you know, transcripts, or anything like that, be given to me at

21  least seven days before the hearing so that I have an

22  opportunity to look at whatever mitigating evidence you have

23  and what other evidence that's not included in that factual

24  resume that you think I should consider.  So seven days out

25  from the sentencing I ask that you submit that.

```
1              MR. BODNAR:  Yes, Your Honor.

2              MR. SOTO:  Yes, ma'am.

3              THE COURT:  Now, the sentencing is set for October

4   the 18th at 10:00 o'clock.  And, before that, Mr. Wilson,

5   you're going to be interviewed by the probation officer, and

6   your attorney may be present during that interview.  You'll

7   have a chance to go over the report, and your attorney will

8   file any objections he has to anything he finds incorrect in

9   that report.

10              At your sentencing hearing, which is set for October

11  the 18th at 10:00 o'clock, you may speak on your own behalf.

12  You may bring witnesses and present any evidence that you feel

13  I need to see.  Also, your attorney will be there to represent

14  you.

15              Do you have any questions?

16              THE DEFENDANT:  No, ma'am.

17              THE COURT:  Anything from the Government?

18              MR. BODNAR:  No, Your Honor.

19              MR. SOTO:  No, ma'am.

20              THE COURT:  Thank you.

21        [Recess.]

22

23

24

25
```

```
1   STATE OF ALABAMA)
                    :
2   COUNTY OF MOBILE)

3

4           I, Melanie Wilkins, do hereby certify that the above

5   and foregoing transcript of proceedings in the matter

6   aforementioned was taken by me in machine shorthand, and the

7   questions and answers thereto were reduced to writing under my

8   personal supervision using computer-aided transcription, and

9   that the foregoing represents a true and correct transcript of

10  the proceedings upon said hearing.

11

12          I further certify that I am neither counsel nor

13  related to the parties to the action, nor am I in anywise

14  interested in the result of said cause.

15

16

17
                            s/Melanie Wilkins
18                          Melanie Wilkins
                            Registered Merit Reporter
19                          Certified Realtime Reporter
                            Official Court Reporter
20                          United States District Court
                            Southern District of Alabama
21                          113 St. Joseph Street
                            Mobile, Alabama  36602
22                          (251) 690-3371

23

24

25
```