```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    SOUTHERN DISTRICT OF ALABAMA

 3                          SOUTHERN DIVISION

 4    ------------------------------------
                                          )  CRIMINAL NO. CR12-00293
 5    UNITED STATES OF AMERICA,           )  COURTROOM 5A
                                          )  U.S. FEDERAL COURTHOUSE
 6                                        )  MOBILE, ALABAMA
      VS.                                 )  DECEMBER 20, 2013
 7                                        )
      MOHAMMAD ABDUL RAHMAN ABUKHDAIR;    )
 8    RANDY LAMAR WILSON, AKA RASHEED     )
      WILSON,                             )
 9                                        )
                          DEFENDANTS.     )
10    ------------------------------------)

11                         SENTENCING HEARING

12            BEFORE THE HONORABLE KRISTI K. DuBOSE

13              UNITED STATES DISTRICT COURT JUDGE

14    APPEARANCES:

15    FOR THE GOVERNMENT:    Christopher John Bodnar, Esq.
                             Sean P. Costello, Esq.
16                           Assistants U.S. Attorney
                             U.S. Attorney's Office
17                           63 South Royal Street, Suite 600
                             Mobile, Alabama  36602
18
      FOR DEFENDANT MOHAMMAD ABDUL RAHMAN ABUKHDAIR:
19
                             Richard D. Yelverton, Esq.
20                           12 North Lawrence Street
                             Mobile, Alabama  36602
21
      FOR DEFENDANT RANDY LAMAR WILSON, JR.:
22
                             Domingo Soto, Esq.
23                           Madden & Soto
                             465 Dauphin Street
24                           Mobile, Alabama  36602

25
```

```
 1   COURT REPORTER:         Melanie Wilkins, RMR, CRR
                             Official Court Reporter
 2                           113 St. Joseph Street
                             Mobile, Alabama  36602
 3                           (251) 690-3371

 4           Proceedings reported by machine stenography.

 5             Transcript produced by computer.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          [December 20, 2014, 7:58 a.m.  The defendants are present

2      with counsel in open court.]

3          THE CLERK:  We are on the record for a sentencing

4  hearing in Criminal No. 12-293, United States of America versus

5  Randy Lamar Wilson, Jr. and Mohammad Abdul Rahman Abukhdair.

6          What says the Government?

7          MR. BODNAR:  The United States is ready to proceed,

8  Your Honor.

9          THE CLERK:  And the defendants?

10          MR. YELVERTON:  We're ready.

11          MR. SOTO:  Ready.

12          THE COURT:  Okay.  What we'll do is we will go

13  through -- let the Government present their evidence as to both

14  defendants.  Is that what you would like to do?

15          MR. BODNAR:  Your Honor, we have -- we would proffer

16  everything that's in our trial brief already.  We do have a

17  witness here today, Ms. Ervin.  She is the special operations

18  analyst for national security cases.  So if you would like the

19  witness on, either for cross-examination purposes or to clarify

20  anything for you, she'd be happy to take the stand.  And she

21  also speaks Arabic, Your Honor, for you.

22          THE COURT:  Well, we'll start with Mr. Wilson.

23  Mr. Wilson's calculation is a total offense level of 42 and a

24  criminal category of VI for a 360 to life, but it has been

25  capped at 180 months pursuant to the plea agreement.

1          There was a rejection to the terrorism enhancement.

2          MR. SOTO:  Judge, I've withdrawn that.

3          THE COURT:  You've withdrawn that.

4          There's also an objection to the cross-reference to

5     murder, that the guidelines cross-reference murder.

6          MR. SOTO:  Yes, Your Honor.

7          THE COURT:  What guideline would you propose is the

8     correct guideline?

9          MR. SOTO:  That's part of the problem with the

10    guideline is that it sets the cross-references to the

11    underlying offense.  If you look at the statute, it says

12    murder, maim, kidnap, or the destruction of property.

13         THE COURT:  So your argument is not that the

14    calculations are incorrect; it's just that the cross-reference

15    is just unreasonable and I shouldn't follow the guidelines, not

16    that that's not the correct guideline?

17         MR. SOTO:  Oh, I don't know why -- if it says, "the

18    underlying offense," why would you then go to the murder part

19    of it when you could go to the destruction of property and

20    another part of the guideline then?  So I do object to the

21    guidelines, yes, ma'am.

22         THE COURT:  Okay.  I know that you object -- okay.

23    So which one do you think I should go to?

24         MR. SOTO:  At the very least, assault.  I think it's

25    in my response, and that would be a much different enhancement,

```
1    I think.
2                THE COURT:  Okay.  But do you agree that the
3    directions in the sentencing guidelines are for them to refer
4    over to the murder one; do you agree with that?
5                MR. SOTO:  No, I do not.
6                THE COURT:  You don't agree that that's what it says?
7                MR. SOTO:  No.  It says, "the underlying offense."
8    And the underlying offense, when we were discussing -- when we
9    were having negotiations about this whole issue, the Government
10   kept insisting that it be cross-referenced to 956.  And in my
11   discussions with Mr. Wilson, I said, well, look, it says
12   murder, maim, kidnap, and the destruction of property.  So I
13   take issue with the idea that you would just --
14               THE COURT:  In the other cases that you've given me,
15   what did they use as the cross-reference?
16               MR. SOTO:  I don't know, Judge.  I haven't a clue.  I
17   don't know.
18               THE COURT:  Okay.  And then your other point was a
19   request for a variance, and you make a couple of points there.
20   And one is that -- I think you quote a judge from another
21   district that says that it imports a fiction into the
22   calculation to immediately put him up to a Category VI.
23               MR. SOTO:  Yes, ma'am.
24               THE COURT:  Of your whole brief, I did agree with
25   that point.  So, actually, I went back and I thought -- I
```

1    looked and said, well, look, he really should be a Category I,

2    but it does nothing for your client because it's still 360 to

3    life, even at a Category I.  And so I don't understand why the

4    guidelines do that, and I think that would be a basis for a

5    variance, but in your case it's still 360 to life.  It doesn't

6    help your client.

7         Are there any other objections?

8         MR. SOTO:  No, Judge.  And --

9         THE COURT:  And I'm going to let you get on your

10   variance, but I just want to let you get to the guideline.

11        MR. SOTO:  I'm not sure if the heartland argument is

12   substantive or part of the 3553, and I think, in the end,

13   whatever the Court decides, is, obviously, the way to go with

14   it.  But I would observe the heartland -- I would say that the

15   heartland argument is also part of the substantive part of it.

16        THE COURT:  Well, as I'm required to do by the 11th

17   Circuit, I do want to make a finding that I do find that the

18   total offense level of 42, as to Mr. Wilson, is correct.  I

19   would vary down to a I on the criminal history category, but

20   the correct calculation is a VI; that is correct.  So that is

21   the finding of the Court, that that is the correct guideline

22   calculation:  The VI and the 42.

23        All right.  Now, as to your request for a variance,

24   I'll let you start.  Do you want to put any evidence on?  I

25   have received letters from his grandmother, several aunts, his

1   wife, and a neighbor and his mother have all written me letters

2   about his background and characteristics as far as his being,

3   you know, a good father and a family man, and they have no

4   belief that he meant any harm to anybody.

5           So anything else you'd like to present?

6           MR. SOTO:  No, ma'am.

7           THE COURT:  Any argument you'd like to make?

8           MR. SOTO:  Well, is the Government -- has the

9   Government --

10          THE COURT:  Are you going to put on any evidence?

11          MR. BODNAR:  Your Honor, unless there's a need to for

12   the Court's understanding.  Outside of what we already have in

13   the brief or in case the defense attorney wants to

14   cross-examine any of those points, then, no, the United States

15   does not intend to put on anything that wasn't already in our

16   trial brief.

17          THE COURT:  Okay.  So why was your request for two

18   days and I narrowed it down to one?

19          MR. BODNAR:  We thought this was going to be a lot

20   longer and realized the best way to go about it was to put it

21   in the trial brief ahead of time.

22          THE COURT:  Okay.  All right, then.  Does your client

23   wish to speak, or do you have anything else you'd like to say?

24          MR. SOTO:  No, ma'am, other than arguments and

25   comments to the Court.

1              THE COURT:  Okay.  Go ahead.

2              MR. SOTO:  Judge, the 3553 considerations, coming to

3    court today, we have to go through a phalanx of security.

4    There's SWAT teams, snipers; there's a lot of external stuff

5    that's driving this case for this man from D.I.P.

6              The guidelines, themselves, are based on a lot of

7    stereotypical notions, and I noticed yesterday that President

8    Obama pardoned somebody from Mobile.  I remember when

9    Judge Butler was grappling with that case.  And that was before

10   the guidelines were discretionary; and what has happened, as

11   you know, in that case from this case, that the guidelines have

12   now engaged in this -- in these kind of notions that he's

13   someone that he's not.  I'd ask you to look at who he is and

14   not who the -- what the guidelines presumably are and to

15   fashion a punishment that's individualized to him.

16             And then in looking at that -- and I've set out the

17   cases, and I think we've set out all -- not all the cases

18   because there's quite a few, but I've set out the cases.  And

19   I've cited to the Court some statistics from the Government

20   itself; that the average sentence in one of these cases is 15.1

21   years, and it's slightly higher when you take into account the

22   Tier I cases.

23             But, in all of those cases, if you'll notice, there's

24   no one that's been charged with speculative jihad intentions.

25   What Randy did was going to go to Mauritania.  He had some

1   intentions in the future, perhaps, of going somewhere else, but

2   there's nothing -- there's no case -- there's no evidence that

3   the Government could present to you of anything tangible, other

4   than speculation, about what he might have done.

5          And in the other cases that we talked about, 23 --

6   the A's and the B's, these people have actually gone to

7   Somalia, have actually been in jihadist camps, have actually

8   carried weapons, have actually done all sorts of actions that

9   you can say, yes, specific intent, there it is.

10         What you're left here in this case is to speculate

11  what he might have done in the future if something happens in a

12  neighboring country or even if it happened in Mauritania.  And

13  I think it's really important that it's Mauritania, and nothing

14  is happening in Mauritania.

15         So I'd ask you to carefully scrutinize and vigorously

16  apply the intent of the guidelines; that you punish Randy

17  Wilson, not Osama bin Laden or any of these other folks; that

18  you fashion a punishment that's applicable to him.

19         And, essentially, what the Government's position has

20  been has been to out Randy because he said some terrible

21  things.  In my mind, he said some terrible things.  He believed

22  some of these things.  Some of the people he admires and

23  romanticizes about are not anybody that I admire, but those are

24  thought crimes, in my mind.  And he has, again, not done

25  anything other than to move his family -- with his family to

1   Mauritania.

2          And I've set out some of the things that he was

3   talking about -- starting a business, asking the confidential

4   informant to get some money so he can start a business.  Again,

5   as far as 3553 characteristics, here's a guy who is such a

6   terrorist that he says, "I can't move yet because my wife has a

7   student loan we have to repay."

8          He worked hard in that fragrance store.  The

9   Government wants to maintain that he's -- that it was a sham,

10  but if we look at what we set out, he worked really hard and

11  diligently to make that fragrance store work.

12         The illusions to there being some sort of dramatic

13  conspiracy, they aren't quite accurate, and I think we set that

14  out, I hope, in the memo.  And that in 2010/2011, some things

15  were said.  They abandoned that idea.  There was a time period

16  when the undercover agent was involved.  There's an outburst by

17  Mohammad talking about things in February.

18         And every one of the other cases that I've looked at

19  when someone says something like "I want to blow something up,"

20  the F.B.I. encourages that or tries to develop that, maybe give

21  somebody some C4 to plant at the Portland Christmas tree or

22  gives them a Stinger missile or something, something tangible.

23         But what did that F.B.I. agent do in February?  He

24  left and wasn't involved again until four or five months later

25  when the under -- when the Confidential Human Source was

1    arrested and was now involved and they came back and Randy came

2    back and made contact with the agent.

3              And there was, at that point, no real discussions

4    about anything other than going to Mauritania and some

5    speculative ideas that "we're going to live there."  And I

6    think one of his comments was "We may have to live in

7    grass-dirt huts," but they wanted to move their families there

8    and have their children raised in an Islamic culture.

9              What you'd have to do -- you're having to extrapolate

10   his animus here, other than some vague intentions, to go to

11   Mauritania and, perhaps, "if something else happens, I might do

12   something."  That really strikes at the heart of the whole

13   criminal justice system.  And you are just having to guess at

14   what his intentions are.

15             Again, he never went to a terrorism training camp.

16   It wasn't his intention to go through a terrorism training

17   camp.  He never bought or received arms.  He never revealed

18   plans or strategic information, and there really isn't any

19   substantive plot or plan that they can point to, other than he

20   had intended something some time in the future.

21             The cases -- and you mentioned Judge O'Toole from

22   Boston.  The cases that are all set out there are all people

23   that have engaged in something much more tangible than what you

24   have here.  And the punishment ranges from six years, eight

25   years, ten years, twelve years.  In the Tarek Mehanna case, he

1   got seventeen years.  His co-defendant, Maldonado, got ten

2   years.  Maldonado actually went to the Somali camps and

3   actually received training.

4           So if the average sentence is 15.1, then how can

5   anyone, in good conscience, punish this young man to 15 years?

6   And that's it, Judge.

7           THE COURT:  Okay.  And we'll turn to Mr. Abukhdair.

8   There's no objections to the report?

9           MR. YELVERTON:  Judge, in consulting with my client

10  and following his advice or his wishes -- and, that is, that I

11  file no objections to the report, that no sentencing memorandum

12  be filed.  And that's where we are.

13          I will say one thing.  I've been doing this almost

14  30 years, and I've never had a more polite, genuinely -- he's a

15  kind person, and I'm saying this on my own, without his

16  permission.  But he genuinely is.  That's all I think I should

17  be expected to say.

18          THE COURT:  Okay.

19          MR. YELVERTON:  Of course, as Your Honor pointed out,

20  the plea agreement and the statute limits the sentence.

21          THE COURT:  And the Government filed an objection to

22  his receiving acceptance of responsibility.  Do you want to

23  speak to that?

24          MR. BODNAR:  Nothing further than what was in our

25  brief, Your Honor.

1          THE COURT:  Okay.  Well, the Court makes a finding

2    that the total offense level is 42 and the criminal history is

3    VI.  Whether he receives acceptance of responsibility or not

4    makes no effect on the 360 to life.  So it's a moot issue.

5          Well, I have -- I've spent, just like I'm sure the

6    defense attorneys have, an enormous amount of time reading the

7    hundreds of pages of conversations that have been provided by

8    the Government.  I've reviewed them, trying to give Mr. Wilson

9    and Mr. Abukhdair every benefit of the doubt.

10          Foremost in my mind was were they just talking a big

11   game, were they really just wanting to travel overseas to --

12   for academic reasons.  I've tried to look at it for every piece

13   of evidence I could find that would support that finding.

14   Unfortunately, there is no other reasonable conclusion that the

15   ultimate plans made to travel to Mauritania and cross into Mali

16   were for the primary purposes of committing violent jihad.  I

17   don't have to speculate about that.  It's clear from the

18   conversations.  They have specifically admitted this.

19          This was not an unsophisticated plot.  This was a

20   well-researched plan that Mr. Wilson and Mr. Abukhdair were

21   deeply committed to carrying out.  Mr. Wilson seemed to be very

22   well-informed as to where he could be of the greatest service

23   to the radical Islamist terrorists determined to commit jihad.

24   The plan extended over two years, taking numerous twists,

25   including even speaking of killing Americans to make their

14

 1   point.

 2            You've expressed disdain for America, hoped for the

 3   death of all nonbelievers, even supported Osama bin Laden.  The

 4   expression of these thoughts and opinions are not a crime.

 5   Most people in this room would support and defend your right to

 6   have these opinions.  You'll not be punished for these beliefs;

 7   however, you crossed the line when you planned to render

 8   assistance to terrorists and then bought your tickets to go do

 9   so.

10            The fact that you were driven by your warped belief

11   that your religion requires you to engage in the murder of

12   others is not a mitigating fact.  I venture to say, perhaps,

13   your actions have hurt the faith, but, in any event, the things

14   I must consider are the factors that are set out by the

15   guidelines.

16            The first one, of course, is the seriousness of the

17   offense I just discussed.  You readily admit that, given the

18   opportunity, you would engage in violent jihad to murder those

19   you deemed an enemy.  I don't have to speculate about that.

20            I've reserved judgment until today because I was

21   really hoping there would be a renouncement of that.  That

22   would have given me some type of wiggle room here, but the lack

23   of remorse or any renunciation of your intentions to commit

24   violent jihad in the future indicates to me that the likelihood

25   of recidivism is still there; it's still high.

1          As far as your background and characteristics, as to

2   Mr. Wilson, there is another side to Mr. Wilson that I've seen,

3   and that is his caring for his family and trying to provide for

4   them.  For positives, the only other positive thing I can say

5   is that you prevailed over Mr. Abukhdair in his thoughts of

6   committing domestic terrorism.

7          As far as deterrence goes, Mr. Wilson was well-versed

8   in the consequences that others had engaged in or had suffered

9   as a result of the same type of conduct, but that didn't deter

10  you.  So I don't think there is even a sentence I could give

11  today that will deter you until you decide that you will

12  renounce any thoughts that you must commit violent jihad in the

13  name of your faith.

14          As far as punishment, the guidelines, the 360 to

15  life, that's just totally unreasonable.  I would never engage

16  in the 360 to life, but that's not before me today.  What's

17  before me is what an appropriate sentence should be and whether

18  the 180 months is an appropriate sentence.  I find that it is

19  in this case, mainly because of the need to protect the public.

20          And, as I said, I was really hoping that I would have

21  a chance to have wiggle room today because these men are so

22  young and, perhaps, could be turned around and, perhaps, their

23  minds could be changed about their thoughts, but there is no

24  renunciation.  Because of that, I must protect the public with

25  the longest amount of time that I can.  And for these reasons,

1  I feel that the harsh sentence of 15 years is justified in both

2  cases.

3          Mr. Wilson, if you will stand, I'll read your

4  sentence.  Pursuant to the Sentencing Reform Act, it is the

5  judgment of the Court that Randy Lamar Wilson is hereby

6  committed to the custody of the Bureau of Prisons for a

7  180 months.

8          Upon release from imprisonment, you'll be on

9  supervised release for three years.  While on supervised

10 release, you shall not commit any federal, state, or local

11 crimes.  You're prohibited from possessing a firearm or other

12 dangerous device and shall not possess a controlled substance.

13         In addition, you're to comply with the standard

14 conditions of supervised release.

15         Also, if deemed necessary by the probation officer,

16 you shall participate in drug testing and treatment and alcohol

17 abuse.

18         I find that you do not have the ability to pay a

19 fine, so a fine is not imposed.

20         I find that the advisory guideline range of

21 180 months is appropriate to the facts and circumstances of

22 this case and addresses the seriousness of the offense, the

23 objectives of punishment, deterrence, and incapacitation.

24         It is ordered that you pay $100 special assessment.

25         I'll hear your objections, Mr. Soto.

1        MR. SOTO:  No, ma'am.

2        THE COURT:  From the Government?

3        MR. BODNAR:  None, Your Honor.

4        THE COURT:  Thank you.

5        Mr. Abukhdair, if you would please stand.  As to all

6   the factors that I have considered for your co-defendant, I

7   find the same to be true of you.  As far as your background,

8   you know, you don't actually have the same type of history.

9   You do have family here, which doesn't seem to all support your

10  beliefs.  You're a young man, but for all the other reasons

11  previously stated, I do find that the 15 years is appropriate.

12  Particularly, your lack of remorse or renunciation of any

13  future plans to engage in violent acts.

14        Pursuant to the Sentencing Reform Act, it is the

15  judgment of the Court that Mohammad Abdul Rahman Abukhdair is

16  hereby committed to the custody of the Bureau of Prisons for a

17  term of 180 months.

18        Upon release from imprisonment, you'll be on

19  supervised release for three years.  While on supervised

20  release, you shall not commit any federal, state, or local

21  crimes.  You're prohibited from possessing a firearm or other

22  dangerous device and shall not possess a controlled substance.

23        In addition, you're to comply with the standard

24  conditions of supervised release.

25        I find that you do not have the ability to pay a

1    fine, so a fine is not imposed.

2           I find the advisory guideline range of 180 months is

3    appropriate to the facts and circumstances of this case and

4    provides a reasonable sentence.

5           It is ordered that you pay $100 special assessment,

6    which is due immediately.

7           I'll hear your objections.

8           MR. YELVERTON:  None, Your Honor.

9           THE COURT:  From the Government?

10          MR. BODNAR:  Your Honor, just to preserve the record,

11   we ask that his attorney, if he doesn't want to make a

12   statement, that his attorney waives his client's right to make

13   a statement.

14          MR. YELVERTON:  I did that.

15          THE COURT:  I'm sorry.  Mr. Abukhdair, do you want to

16   make a statement?

17          DEFENDANT ABUKHDAIR:  No.

18          THE COURT:  And he shook his head no.

19          Sentence is imposed as stated.

20          And Mr. -- what happened to Mr. Wilson?

21          MR. SOTO:  They took him away.

22          THE COURT:  All right.  I wasn't ready for Mr. Wilson

23   to leave.  He needs to be notified of his right to have 14 days

24   to file his notice of appeal.

25          Mr. Abukhdair, you have 14 days to file your notice

```
1    of appeal if you wish to appeal.

2              THE CLERK:  Judge, do you want to him to have drug

3    treatment and testing?

4              THE COURT:  Yes.

5              PROBATION OFFICER:  Are there any remaining counts?

6              THE COURT:  Count 2 to be dismissed?

7              MR. BODNAR:  Yes, Your Honor.

8              THE COURT:  Okay.  I need to inform Mr. Wilson of his

9    right to appeal, but Mr. Abukhdair may be taken.

10        [Brief recess.]

11             THE COURT:  I'm sorry about the confusion here.  If

12   you'll just stand right here at the podium.  Mr. Soto can stand

13   with you.  Mr. Wilson, you do have a right to appeal.  You have

14   14 days to file a notice of appeal, and you need to consult

15   with your attorney to determine whether you wish to appeal.

16   Thank you.

17             MR. SOTO:  Judge, pursuant to the plea agreement,

18   we've waived the right to appeal.

19             THE COURT:  Okay.  He needs to sign a notice of

20   non-appeal.

21             MR. SOTO:  Do you want to sign it?

22             THE COURT:  But you need to talk with him first and

23   then decide on it.

24             All right.  We are in recess.

25        [Recess.]
```

```
1   STATE OF ALABAMA)
                    :
2   COUNTY OF MOBILE)

3

4         I, Melanie Wilkins, do hereby certify that the above

5   and foregoing transcript of proceedings in the matter

6   aforementioned was taken by me in machine shorthand, and the

7   questions and answers thereto were reduced to writing under my

8   personal supervision using computer-aided transcription, and

9   that the foregoing represents a true and correct transcript of

10  the proceedings upon said hearing.

11

12        I further certify that I am neither counsel nor

13  related to the parties to the action, nor am I in anywise

14  interested in the result of said cause.

15

16

17
                          s/Melanie Wilkins
18                        Melanie Wilkins
                          Registered Merit Reporter
19                        Certified Realtime Reporter
                          Official Court Reporter
20                        United States District Court
                          Southern District of Alabama
21                        113 St. Joseph Street
                          Mobile, Alabama  36602
22                        (251) 690-3371

23

24

25
```